**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.**

**EMORY ANDREW TATE**
**TRISTAN TATE**

Petitioners,

v.

**TODD BLANCHE**

United States Attorney General

**MARCO RUBIO**

United States Secretary of State

**PRISCILLA PEREZ LOPEZ**

U.S. Marshal for the Southern District of Florida

and

**E.K. CARLTON,**

Warden, Federal Detention Center, Miami

Respondents.

_______________________________/

# PETITION FOR WRIT OF HABEAS CORPUS

This petition presents a fundamental legal question: whether U.S. citizens (with no criminal history) arrested pursuant to an extradition warrant lodged by a foreign government (the United Kingdom) for non-capital offenses (rape) that allegedly occurred

about ten years ago are presumptively entitled to release on bail, unless the government establishes that the extraditee is a flight risk or a serious danger to the community.

123 years ago, the United States Supreme Court confirmed that courts have the power to set bail in extradition cases:

> We are unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief.

*Wright v. Henkel,* 190 U.S. 40, 63 (1903). Unfortunately, many lower courts have misunderstood *Wright* as having created a strong presumption against bail, requiring first, that the extraditee, and not the government, bear the burden of demonstrating he poses neither a risk of flight nor a danger to the community, and second, that the extraditee establish the existence of "special circumstances" over and above the usual requirements of showing that the government has failed to establish that the extraditee is a flight risk or serious danger to the community.

*Wright's* caution about bail was a function of the time in which it was decided: in 1903, there was no practical way to ensure an extraditee's availability to surrender to the foreign authorities on the warrant, as there was no way to track an extraditee's location short of detention. Today, the combination of electronic monitoring, ensuring that the government knows an extraditee's location 24/7, and transatlantic air travel, which guarantees that an extraditee can arrive in the requesting country in a matter of hours by commercial aircraft, rather than weeks by steamship, makes it so there are practical

alternatives to incarceration—home detention, for example—that can adequately ensure an extraditee's surrender after the conclusion of an extradition hearing, if so ordered. Over the last 123 years, no discernible legal standards or criteria have developed to define what exactly constitutes "special circumstances" warranting release on bond, despite the invention of technology that can all but ensure an extraditee's delivery to the requesting country.

On July 18, 2026, brothers Andrew and Tristan Tate were arrested in the Southern District of Florida on provisional arrest warrants pending their extradition to the United Kingdom. The brothers are dual U.S. / U.K citizens with no criminal history and no criminal charges pending against them in the United States. Relying on *Wright*, Magistrate Judge Lauren Louis denied them bail, finding that they failed to meet their burden to show, whether by clear and convincing evidence or by a preponderance of the evidence, that (1) they do not pose a risk of flight or a danger to the community; and (2) special circumstances warrant release on reasonable conditions of bond.

Andrew and Tristan have resided in Romania since 2017. In December 2022, they were arrested in Romania, a country of which they are not citizens, and charged with serious sexual offenses. The Bucharest Court of Appeal released them—first on house arrest, then judicial control. The Tates have been on conditional release in Romania since March 2023 and have fully complied with all of the conditions of release. On February 25, 2025, the Romanian prosecutor lifted the travel restrictions prohibiting Andrew and Tristan from leaving Romania. The prosecutor assessed all of the requirements necessary for this

measure and determined there was no risk that the brothers would evade the criminal proceedings or otherwise obstruct the administration of justice.

Since the travel restrictions were lifted, the Tates have traveled to the United States, Dubai / the U.A.E., Croatia, the Bahamas, Turkey, Kazakhstan, Oman, Hong Kong, Uzbekistan, Russia, and Cyprus, and always returned to Bucharest to check in with Romanian authorities as required by the conditions of their release.

In an unusual twist, the requesting country, the United Kingdom, has already sought—and obtained—an Order extraditing the Tates to the U.K. from Romania. On March 11, 2024, the U.K. initiated extradition proceedings in Romania against the Tates based on the same allegations described in the provisional U.S. arrest warrant. The Romanian court held an extradition hearing on March 12, 2024, and agreed to surrender the Tates to the U.K. at the conclusion of the Romanian criminal case. For more than two years, the U.K. respected the Romanian order deferring the surrender of the brothers to the U.K. until the proceedings in Romania concluded.

And yet, the magistrate judge found that this documented compliance and the existing surrender order, in addition to the Tates' lack of criminal history and dearth of recent allegations involving violence, were not sufficient for bail. But in her ruling, the magistrate judge, like many other extradition courts across the country, failed to articulate any special circumstances where bond *would* be granted. The "special circumstances" set forth by *Wright* have become a standardless standard, resulting in the arbitrary application of a "test" that denies extraditees due process in their bail determination.

Andrew and Tristan submit that the "special circumstances" test should be interpreted to mean circumstances *that will reasonably assure the extradition court that the extraditee is not likely to flee or pose a danger to the community—thus minimizing the risk of diplomatic embarrassment.* Reasonable conditions of release, like electronic monitoring or hired security, that can ensure the delivery of an extraditee short of incarceration should satisfy the special circumstances contemplated by the Supreme Court 123 years ago when it decided *Wright v. Henkel.* And because extradition proceedings are criminal in nature, the presumption should be *in favor* of bail, as contemplated by the Founders in the Judiciary Act of 1789. Rather than burdening extraditees with demonstrating they are entitled to bail, the government should bear the burden of proving that an extraditee poses a risk of flight and danger to the community.

## 1. JURISDICTION AND VENUE

This action challenges the confinement of Petitioners Andrew and Tristan, who are in federal custody based on a pending extradition request from the United Kingdom.

This Court has jurisdiction over this Petition for Writ of Habeas Corpus under 28 U.S.C. §§ 1331, 1343(a)(4), and 2241, as this action arises out of the Constitution and laws of the United States of America. Andrew and Tristan seek immediate action to redress the deprivation of their fundamental Constitutional rights.

Venue is appropriate in the United States District Court for the Southern District of Florida because Andrew and Tristan are currently in custody in this district, at the Federal Detention Center in Miami, Florida.

## 2. PARTIES

Emory Andrew Tate and Tristan Tate have been remanded to detention in Miami-Dade County pursuant to an Order of Detention issued by Magistrate Judge Lauren Louis on September 9, 2026. Andrew and Tristan face extradition to the United Kingdom should Magistrate Judge Louis issue a Certification of Extradition and if the Secretary of State approves the request.

## 3. PROCEDURAL BACKGROUND

On July 18, 2026, at the request of the British government, the United States filed a Complaint for Provisional Arrest with a View Towards Extradition against Andrew Tate [26-mj-03260-LFL, DE 3] and Tristan Tate [26-mj-03259-LFL, DE 3] seeking the provisional arrest and detention of Andrew and Tristan, dual United States and United Kingdom citizens, pursuant to Article 12 of the extradition treaty between the United States and the United Kingdom.[1] The Complaints allege that the Tates are wanted for prosecution for rape in the U.K. The Complaints were assigned to United States Magistrate Judge Lauren Louis, who issued an arrest warrant for Andrew and Tristan. The government

[1] *See* Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc. No. 108-23 (2004) (the "2003 Treaty"), and related Exchanges of Letters, *as amended by* the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

moved for detention pending the conclusion of the extradition proceeding. 26-mj-03260-LFL, DE 11-1; 26-mj-03259-LFL, DE 12-1.

That same day, the Tates were arrested in Miami, Florida, and on July 20, 2026, the Tates had an initial appearance before the court. 26-mj-03260-LFL, DE 10; 26-mj-03259-LFL, DE 11. On August 7, 2026, the Tates filed a Motion for Release Pending Extradition Proceedings. *Id.*, DE 23, 24. On August 27, 2026, the court conducted a detention hearing. The Tates requested release on bond, arguing that they are neither a flight risk nor a danger to the community, and that special circumstances warrant their release, including (1) the Romanian Surrender Orders; (2) the delay in prosecution; (3) availability of bond in the United Kingdom; (4) the absence of urgency; (5) the Tates' public visibility and recognizability; (6) the Tates' compliance with Romanian conditions of release; (7) lack of probable cause; (8) the conditions of the Tates' confinement in the SHU and the length of the proceedings; and (9) pending proceedings in Palm Beach County and Romania. *Id.*; *see also* DE 44 (both cases).

Magistrate Judge Louis denied bail and ordered that the Tates should remain detained. 26-mj-03260-LFL, DE 64; 26-mj-03259-LFL, DE 66. The Tates have been detained in the Special Housing Unit ("SHU") at FDC since their arrest on July 18, 2026.

On October 5, 2026, the government filed a Redacted Copy of The United Kingdom's Formal Extradition Request for both Andrew and Tristan. 26-mj-03260-LFL, DE 68; 26-mj-03259-LFL, DE 72. The extradition hearing has not yet been scheduled.

## 4. STATEMENT OF FACTS

### I. <u>The Romanian Proceedings</u>

In December 2022, Andrew and Tristan were arrested in Romania and charged with sexual offenses. The Bucharest Court of Appeal permitted their release, first on house arrest, then judicial control. In February 2025, after reviewing the brothers' conduct, the Romanian prosecutor determined that Andrew and Tristan had "rigorously complied" with every obligation and "there are no plausible reasons to consider that they would have any intention of evading criminal prosecution and trial; on the contrary, they have constantly demonstrated interest in the correct establishment of the facts." *See* February 25, 2025, Order in Romanian Criminal Case No. 1305, attached as **Exhibit 1**; February 25, 2025, Order in Romanian Criminal Case No. 2557, attached as **Exhibit 2**.

In two sworn affidavits, the Tates' Romanian counsel, Eugen Constantin Vidineac, explains the Romanian proceedings, one explaining case no. 1305/D/P/2022, attached as **Exhibit 3,** and one explaining case no. 2557/D/P/2023, attached as **Exhibit 4.**

The Romanian authorities arrested the Tates on December 30, 2022, in criminal case no. 1305/D/P/2022, and held them in pre-trial detention from December 30, 2022 until March 31, 2023. **Ex. 3**, p. 1.

On March 31, 2023, the Bucharest Court of Appeal replaced pre-trial detention with house arrest for 30 days with the following obligations:

- To appear before the criminal investigation authority, the judge of rights and freedoms, the preliminary chamber judge, or the trial court whenever summoned;

- Not to communicate, by any means, either directly or indirectly, with the other co-defendants, the alleged injured parties, or the witnesses in the case.

*Id*.

The Voluntari Town Police monitored the Tates' compliance, and there is no evidence of any breach. *Id*. The Court successively extended the house arrest and related conditions in 30-day increments until August 4, 2023, when the Bucharest Court of Appeal replaced house arrest with judicial supervision (judicial control) for a 60-day period, from August 4 until October 2, 2023, under the following conditions:

- To appear before the preliminary chamber judge or the trial court whenever summoned;
- To immediately inform the judicial authority that ordered the measure, or before which the case is pending, of any change of residence;
- To report to the police authority designated to supervise compliance, namely the police station having territorial jurisdiction over their residence, in accordance with the supervision schedule established by the police authority or whenever summoned;
- Not to leave . . . Bucharest, except with the prior authorization of the preliminary chamber judge or the trial court;
- Not to approach the other co-defendants, the alleged injured parties, or the witnesses in the case;
- To periodically provide relevant information regarding their means of subsistence;
- Not to possess, use, or carry firearms.

*Id*., pp. 1-2.

On November 23, 2023, the court relaxed the Tates' travel restrictions, allowing them to travel outside Bucharest but requiring they remain within the territorial limits of Romania. *Id*., p. 2.

In June 2023, the prosecutor issued an indictment and referred Andrew and Tristan for trial in case no. 1305/D/P/2022. *Id*. The prosecutor severed some of the allegations, resulting in criminal case file no. 2557/D/P/2023 being registered before the Directorate for Investigating Organized Crime and Terrorism ("DIICOT"). Thus, as of June 2023, two criminal cases were proceeding in parallel. *Id*.

In case no. 1305/D/P/2022, the Tates remained on judicial control, subject to review every two months. *Id*., p. 3. On February 25, 2025, the prosecutor lifted the restrictions prohibiting Andrew and Tristan from leaving Romania. *Id*. The prosecutor assessed the requirements necessary for this measure, and found Andrew and Tristan strictly complied with all conditions of release from the beginning of their judicial control. *Id*. The prosecutor also determined there was no risk the brothers would flee or obstruct the administration of justice. The prosecutor found:

> Specifically, it is considered that *there are no plausible grounds to conclude that they intend to evade criminal prosecution and trial*; on the contrary, they have consistently demonstrated a genuine interest in establishing the factual circumstances correctly and in ensuring the resolution of the present case.

*Id*. (emphasis added). **Ex. 1**.

The Tate brothers remained on judicial control in case no. 1305/D/P/2022 without incident until April 6, 2026. **Ex. 3**, p. 3. According to a July 20, 2026 assessment and the lead prosecutor's findings, Andrew and Tristan complied fully, accurately, and in a timely manner with all release obligations imposed upon them for over three years. *Id*.

The Tates were also subject to pretrial release on conditions in the parallel (severed) proceeding, case no. 2557/D/P/2023. **Ex. 4**. On August 23, 2024, the Bucharest

Tribunal denied DIICOT's application for pre-trial detention, imposed house arrest for Andrew, and Tristan remained under judicial control. *Id.*, ¶ 2. On February 14, 2025, the Court replaced Andrew's house arrest with judicial control. *Id.*, ¶ 3. Then, on February 25, 2025, the court lifted the Tates' travel restrictions. *Id.*, ¶ 5. **Ex. 2.** Andrew and Tristan remained on judicial control (Andrew until September 25, 2026, and Tristan until August 31, 2026) with the following conditions of release:

- To appear before the criminal investigation authorities, the preliminary chamber judge, or the trial court whenever summoned;
- To immediately inform the criminal investigation authorities, the preliminary chamber judge, or the court of any change of residence;
- To report to the police authorities designated to supervise compliance, in accordance with the supervision schedule established by them or whenever summoned;
- Not to communicate, either directly or indirectly, with the defendants, the alleged victims/injured parties and the witnesses in this case.

**Ex. 4**, ¶ 8. Under these conditions, Andrew and Tristan must still check in with the authorities in Bucharest when requested.

Since the travel restrictions were lifted in both cases, the Tates have traveled to the U.S., Dubai / the U.A.E., Croatia, the Bahamas, Turkey, Kazakhstan, Oman, Hong Kong, Uzbekistan, Russia, and Cyprus.

The U.S., the U.A.E., Turkey, Croatia, and Cyprus all have extradition agreements with the U.K. *See* Extradition Treaty, U.S.-U.K., Mar. 31, 2003, T.I.A.S. No. 07-426; Extradition Treaty, U.K.-U.A.E., Dec. 6, 2006, 2008 Gr. Brit. T.S. No. 6 (Cm. 7382); Trade and Cooperation Agreement, EU-U.K., art. 596, Dec. 30, 2020, 2021 O.J. (L 149) 10

(governing U.K.-Cyprus and U.K.-Croatia surrender); European Convention on Extradition, Dec. 13, 1957, E.T.S. No. 24, 359 U.N.T.S. 273 (United Kingdom, Turkey, Croatia, and Cyprus all parties). Even when the Tates traveled to jurisdictions from which the U.K. could not readily obtain their surrender—including Russia and Hong Kong—they returned to Bucharest as required.

As stated in the declarations of the brothers' Romanian counsel, Andrew and Tristan complied fully, accurately, and in a timely manner with all release obligations in both criminal cases. *See* **Ex. 3, p. 3; Ex. 4, p. 4**.

## II. <u>The U.K. Charges and the Extradition Proceedings in Romania</u>

The U.K. did not begin investigating the Tates until several years after the conduct alleged in the complaints and the extradition package.

On January 19, 2024, the Crown Prosecution Service obtained TaCA arrest warrants for Andrew and Tristan for rape.[2] U.K. counsel Andrew Ford represents the brothers for these charges, and his declaration is attached as **Exhibit 5.**

On March 11, 2024, based on the TaCA warrants, the U.K. initiated extradition proceedings in Romania against the Tates. *See* March 12, 2024 Judgment No. 38/F, Case no. 1714/2/2024 (846/2024) (Romania Bucharest Court of Appeal–First Criminal Division) (A. Tate), attached as **Exhibit 6**; March 12, 2024 Judgment No. 37/F, Case no.

---

[2] A TaCA warrant is an international arrest warrant used for streamlined extradition between the United Kingdom and European Union member states under the EU-UK Trade and Cooperation Agreement. *See* https://www.cps.gov.uk/prosecution-guidance/extradition-uk-0#a12.

1713/2/2024 (845/2024) (Romania Bucharest Court of Appeal–First Criminal Division) (T. Tate), attached as **Exhibit 7**. The Tates were released one day after their arrest under their previous release conditions. *See* **Ex. 6,** p. 9; **Ex. 7,** p. 10.

The Romanian court held an extradition hearing on March 12, 2024. *Id*. At the hearing, Andrew told the court that

> he was falsely accused years ago and did not understand how much his life would be ruined by those accusations. Over time, he understood that those hardships were given to him in order to grow, develop and evolve, especially since he knows deep in his heart that he is innocent and has strived to prove this. His brother mentioned that if he were to go to England, he would be free, because the institution of pre-trial detention does not exist there, but nevertheless, he wishes to remain in Romania, to prove that he has always told the truth and *wishes for the trial in Romania to be concluded, after which he will go to England on his own to resolve his issues there as well, thus he will not flee anywhere.*

**Ex. 6, p. 3.**

Tristan made the following statement:

> From the beginning of the process, he has made two requests to leave Romania: the first for his mother's birthday and the second due to the fact that his mother suffered a heart attack. The prosecutor rejected both requests, stating that if he were to leave for England, he would evade criminal responsibility in Romania. Even though he has not seen his mother to this day, and now there is a special opportunity to do so, even though his family and friends are there, and even though he could work to support his family [in the U.K.], *he wishes to remain in Romania to prove that the accusations against him are false and that he does not intend to flee.* He does this for the sake of his reputation, his family, and his daughters. Although he desires to be in the United Kingdom, he requests to remain in Romania under the judicial control measure, as this is his opportunity to prove his innocence, even though it is possible that drastic measures will be taken against him—measures that do not exist in the U.K. *However, he places his full trust in the Romanian judicial system and is awaiting the start of the trial to clarify everything. Only after that will he go to see his mother* (in the U.K.).

**Ex. 7**, pp. 4-5 (emphasis added).

The court agreed to enforce the TaCA warrants and to surrender the Tates to the U.K. at the conclusion of the Romanian criminal case:

> [H]aving regard to the fact that, at present, the requested person TATE EMORY ANDREW is being investigated in the case forming the object of criminal file no. 18906/3/2023 pending before the Bucharest Tribunal – First Criminal Division, the Court finds that, in the present case, the provisions of art. 114 para. 1 in relation to art. 58 para. 1 of Law no. 302/2004, republished, are applicable, according to which, in the event that a requested person is being criminally investigated by the Romanian judicial authorities, *his surrender shall be postponed until the final settlement of the case, and, if he is sentenced to imprisonment to be served under a detention regime, until his release as a result of conditional release or until the sentence is fully served*.

**Ex. 6**, p. 8 (emphasis added). On the same day, the court issued a parallel order for Tristan with almost identical language. **Ex. 7**, p. 9.

For more than two years, the U.K. respected the Romanian order deferring the surrender of the brothers to the U.K. until the proceedings in Romania concluded.

## III. <u>The Present Case</u>

On July 18, 2026, the U.K. requested that the United States government file a complaint for the provisional arrest of the Tate brothers with a view toward extradition. 26-mj-03260-LFL, DE 3; 26-mj-03259-LFL, DE 3. The complaints arose from the same allegations and the same warrants that the U.K. submitted to Romania for the surrender of the brothers. Andrew and Tristan were arrested in Miami on July 18, 2026; they made their initial appearance in the district court on July 20. 26-mj-03260-LFL, DE 10; 26-mj-03259-LFL, DE 11. Since then, the brothers have been detained in the SHU at FDC-Miami.

On August 27, 2026, Magistrate Judge Louis held a detention hearing. Several witnesses gave sworn testimony in support of the Tates' request for release, including Andrew Ford, the Tates' retained solicitor in England and Wales, who explained some of the foreign proceedings; Natasha Sesai, Andrew's girlfriend, who described her relationship with Andrew and her observations of Tristan over the course of her relationship with Andrew; as well as Tristan and Andrew, who testified on their own behalf. 26-mj-03260-LFL, DE 64; 26-mj-03259-LFL, DE 66. U.K. Attorney Ford gave background testimony as to the United Kingdom's efforts to investigate, arrest, charge, and extradite Andrew and Tristan. *Id*. Ms. Sesai testified as to the Tates' character, specifically, that Andrew's public-facing alter ego, "Top G," differs materially from the individual behind the persona. She also gave general testimony as to Tristan's character and demeanor. *Id*. Tristan testified about the conditions of his and Andrew's confinement at FDC, his limited assets, and his belief that the charges against him have been fabricated. *Id*. Andrew similarly testified about the conditions of confinement, his adamant denial of any wrongdoing relating to the foreign charges, and his social media presence. *Id*.

In the Order denying bail, the Magistrate Judge wrote that foreign extraditions are "*sui generis* in nature . . . and set forth their own law." *Id*. (citing *Matter of Extradition of Bell*, 2021 WL 1616127, at *2 (S.D. Fla. Apr. 26, 2021)). The Order states that there is a "well-established presumption against bond in extradition proceedings, reflecting among other interests the value the United States places on fulfilling its obligations under international law to a country requesting extradition." *Id*. (citing *In re Extradition of*

*Pelletier*, No. 09-22416-MC, 2009 WL 3837660, at *3 (S.D. Fla. Nov. 16, 2009); *Wright v. Henkel*, 190 U.S. at 62; *Martin v. Warden*, 993 F.2d 824, 827 (11th Cir. 1993)). In a prior order denying bail in an extradition case, the Magistrate Judge held that an extraditee's burden "in showing special circumstances warranting release on bond cannot be overstated; considering this Court's limited role in an extradition proceeding, contemplating any bond is antithetical to that process." *In the Matter of the Extradition of Cesar Horacio Duarte Jaquez*, 20-mc-0228290-UNA, DE 24 (S.D. Fla. 2020).

In denying the Tates' request for release, the Magistrate Judge held:

> [U]nlike in a domestic criminal case, where the Government bears the burden of establishing that the accused is a risk of flight or danger to the community, a respondent in foreign extradition proceedings bears the burden of showing that he is neither a risk of flight nor a danger to the community, and must further show that special circumstances warrant his release. *Matter of Extradition of Yungman*, No. 24-MC-61373, 2024 WL 4581265, at *2 (S.D. Fla. Oct. 25, 2024); *In re Extradition of Rollo*, No. 20-80746-MC, 2020 WL 13379288, at *1 (S.D. Fla. May 28, 2020).
>
> There is a lack of consensus as to whether the respondent must meet that proof by clear and convincing evidence, or by a preponderance of the evidence. *See Matter of Extradition of Headley*, No. 18-mc-81148, 2018 WL 4938553, at *7 (collecting cases). As set forth below, *the Court concludes that Respondents have failed to meet their burdens to demonstrate entitlement to release under either standard.*

*Id*. (emphasis added).

On October 5, 2026, the government filed a Redacted Copy of The United Kingdom's Formal Extradition Request for both Andrew and Tristan. 26-mj-03260-LFL, DE 68; 26-mj-03259-LFL, DE 72. The extradition hearing has not yet been scheduled.

## 5. STANDARD OF REVIEW

As neither the district court nor the court of appeals has jurisdiction over an appeal from a detention order by an extradition court, *In re Extradition of Ghandtchi*, 697 F.2d 1037, 1037 (11th Cir. 1983), collateral review via a petition for a writ of habeas corpus is the appropriate vehicle for a district court to review a magistrate judge's detention order. *See Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011) (citing 28 U.S.C. § 2241); *In re Extradition of Nascimento*, 2021 WL 1192144, at *2 (M.D. Fla. Jan. 25, 2021). It is the burden of the petitioner to show by a preponderance of the evidence that the magistrate judge's order was not lawful. *Skaftouros*, 667 F.3d at 157.

Andrew and Tristan file this petition for habeas corpus to the District Court and present the following grounds for relief:

## 6. CLAIMS PRESENTED

Andrew and Tristan are innocent of the offenses charged and intend to vindicate their name in the U.K. court. But in the meantime, the Tates are being held without bail in the SHU at FDC Miami pending a not-yet-scheduled extradition hearing. The Magistrate Judge denied the Tates' motion for bail pending the extradition hearing, applying a presumption favoring detention in extradition cases unless the extraditees demonstrate by either a preponderance of the evidence or by clear and convincing evidence that they pose neither a risk of flight nor a danger to the community and that "special circumstances" exist to grant bail. In her Order, the Magistrate Judge stated that she was bound by Eleventh

Circuit precedent on the "special circumstances" test. 26-mj-03260-LFL, DE 64, p. 6; 26-mj-03259-LFL, DE 66, p. 6.

But for decades, district courts in this circuit, and across the country, have misinterpreted the standard set forth more than a hundred years ago in *Wright v. Henkel* as burdening the extraditee with demonstrating first, by clear and convincing evidence, he poses neither a risk of flight nor danger to the community, and second, that "special circumstances" warrant his release. This is a clear affront to the extraditee's constitutional rights: "In our society liberty is the norm, and detention prior to trial or without trial is the *carefully limited exception*." *United States v. Salerno,* 481 U.S. 739, 755 (1987) (emphasis added). Accordingly, the burden should be on the government to prove that Andrew and Tristan pose a risk of flight and danger to the community in order to keep them detained, not the other way around.

First, extradition is criminal in nature, where, as here, the United States arrests and seeks to further detain the extraditee to face trial and potential punishment upon conviction for alleged criminal offenses, albeit in a foreign country. Under our laws, such a proceeding requires that the government bear the burden of proof, and persuasion, of demonstrating that a criminal defendant should remain detained. *See United States v. Quartermaine,* 913 F.2d 910, 915 (11th Cir. 1990). In fact, "[f]rom the passage of the Judiciary Act of 1789, 1 Stat. 73, 91," federal law has "unequivocally provided that a person arrested for a non-capital offense *shall be admitted to bail*." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). It should not matter whether that offense is based on foreign or domestic law: The burden should

remain on the government to demonstrate that an extraditee should be detained. This framework is essential in order to protect American citizens from being indiscriminately detained without bail on unproven foreign charges, and under this framework, Andrew and Tristan Tate would have been entitled to release on reasonable conditions of bond.

Next, the Court should find that the heavy presumption *Wright* purportedly imposes against bail in every extradition case, without regard to an extraditee's particular circumstances, violates the Excessive Bail Clause and the Due Process Clause of the United States Constitution, and nullifies the presumption of innocence. Worse, as courts have recognized, there are no discernible legal standards or criteria guiding the determination of bail in extradition cases today. When bail is actually granted, the decision is made arbitrarily.

Finally, even if this Court finds that the heavy presumption under *Wright* is lawful in extradition proceedings and that the special circumstances test should stand, the Court should find that the Magistrate Judge misapplied the special circumstances test in this case and vacate the detention orders. Andrew and Tristan more than met their burden to show they posed neither a risk of flight nor danger to the community, and presented a plethora of special circumstances, recognized by several federal courts across the country, warranting their release on reasonable conditions of bond.

**Count I: Extradition Proceedings Are Criminal in Nature, Not Administrative, and Therefore Bail Should Be the Norm, Not the Exception.**

Since the Supreme Court decided *Wright v. Henkel*, federal courts across the country, including the magistrate court in this case, have read that decision to mean that

extradition proceedings are *sui generis* and that there is a "well-established presumption against bond in extradition proceedings." 26-mj-03260-LFL, DE 64, p. 4; 26-mj-03259-LFL, DE 66, p. 4. That framework is wrong. Andrew and Tristan, like most extraditees, were denied bail because the magistrate judge felt constrained by a fundamental misreading of *Wright*'s "special circumstances" language. Properly understood, an extradition proceeding is criminal in nature. And in criminal proceedings, this country has treated bail as the norm since before the Founding.

a. *Extradition proceedings are criminal in nature.*

An extradition court's central task is to satisfy the Fourth Amendment's bar on unreasonable seizures. It must decide whether there is probable cause to seize the extraditee and deliver him to a foreign government for criminal prosecution—the proceedings exist to ensure that the United States is constitutionally authorized to arrest a person sought by a foreign country to answer a criminal charge. *See In re Metzger*, 46 U.S. 176, 188 (1847) ("Where a district judge, at his chambers, decided that there was sufficient cause for the surrender of a person claimed by the French government, and committed him to custody to await the order of the President of the United States, this court has no jurisdiction to issue a habeas corpus for the purpose of reviewing that decision.").

In *Metzger*, which took place before there was a federal extradition statute, France requested the extradition of an alleged forger from James Buchanan, who was then Secretary of State, under a treaty in force in both countries. *In re Metzger*, 17 F. Cas. 232, 233 (S.D.N.Y. 1847). Secretary Buchanan recognized that, under the Fourth Amendment,

the federal government could not arrest anyone without a finding of probable cause to believe that the person committed a crime specified in a federal law. *Id*. In extradition cases, the extradition treaty serves as the federal law specifying the crimes for which probable cause might be established. *Id*. Secretary Buchanan directed the U.S. Attorney to get an arrest warrant from a judge. *Id*. The district court later agreed that the United States has no power to arrest, much less extradite, anyone without a judicial finding of probable cause to believe he committed an extraditable offense specified in a binding extradition treaty:

> [I]t is manifest that the provision demanding the apprehension and commitment of persons charged with crimes cannot be carried into effect in this country, but by aid of judicial authority. Not only in the distribution of the powers of our government does it appertain to that branch to receive evidence and determine upon its sufficiency to arrest and commit for criminal offences, but the prohibition in the constitution against issuing a warrant to seize any person except on probable cause first proved necessarily imports that issuing such warrant is a judicial act.

*Id.*

The Supreme Court affirmed, commending Secretary Buchanan for involving the courts: "Whether the crime charged is sufficiently proved, and comes within the treaty, are matters for judicial decision; and the executive, when the late demand of the surrender of Metzger was made, very properly as we suppose, referred it to the judgment of a judicial officer." *Metzger*, 46 U.S. at 188–89.

Congress codified *Metzger* the next year. *See* 9 Stat. 302, 30 Cong. Ch. 167 (12 Aug 1848). Today's extradition statute, 18 U.S.C. § 3184, is substantially similar to its 1848 precursor. This history shows that, from the earliest extraditions, all three branches of the United States government have recognized that an extradition proceeding is criminal in

nature. The current proceeding is practically indistinguishable from a probable cause hearing testing the validity of a domestic arrest. An arrest on an extradition warrant is an unconstitutional seizure unless two conditions are met: (1) a valid treaty is in effect, which defines and gives notice of the offenses that may subject a person to extradition; and (2) a judicial officer finds probable cause to believe the extraditee committed one of those offenses. This mirrors the general rule governing the constitutionality of domestic arrests. *See, e.g.*, *Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("[E]very arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause."); *Dunaway v. New York*, 442 U.S. 200, 213 (1979) ("[A]ny exception that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are reasonable only if based on probable cause.") (internal quotations omitted).

An extradition hearing can be more complicated because the offense is defined by foreign as well as domestic law, and the parties and the court must study unfamiliar foreign law. But that added complexity does not change that the proceeding is a criminal inquiry. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.") (internal quotation marks and citation omitted). It follows that such proceedings must be conducted within statutory and constitutional limits.

b. *The right to bail in criminal cases is fundamental in the United States.*

The right to bail in criminal cases is a fundamental right in this country that predates the Constitution itself. It draws on English law, which by 1689 prohibited "excessive bail," *Carlson v. Landon*, 342 U.S. 524, 545 (1952) (citing 1 W. & M., sess. 2, c. 2, § I(10)), and on colonial charters that followed. Pennsylvania's 1682 Frame of Government, for example, provided "[t]hat all prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident, or the presumption great." Frame of Government of Pennsylvania, Laws Agreed Upon in England ¶ XI (1682), *reprinted in* 5 F. Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3052, 3061 (1909). While the Constitutional Convention was sitting in Philadelphia in the summer of 1787, the Confederation Congress wrote the same guarantee into the Northwest Ordinance: "All persons shall be bailable, unless for capital offences, where the proof shall be evident, or the presumption great." Northwest Ordinance of 1787, art. II, 32 J. Continental Cong. 334 (1787), *reprinted in* 1 Stat. 52 n. The First Congress re-enacted the Ordinance as one of its first acts. Act of Aug. 7, 1789, ch. 8, 1 Stat. 50.

The First Congress then made the right to bail the law of the federal courts. On September 24, 1789, President Washington signed the Judiciary Act of 1789. Section 33 of that Act provided:

> And upon all arrests in criminal cases, *bail shall be admitted*, except where the punishment may be death, in which cases it shall not be admitted but by the supreme or a circuit court, or by a justice of the supreme court, or a judge of a district court, who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law.

Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91 (emphasis added).

Section 33 made bail mandatory in every non-capital case: bail "shall be admitted." The accused bore no burden of proof and had to show no "special circumstances." Even in capital cases, bail was not forbidden. It was committed to the discretion of the federal judges, guided by the nature of the offense and the strength of the evidence.

That guarantee has remained the backbone of federal law ever since. As the Supreme Court explained in *Stack v. Boyle*:

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

342 U.S. at 4 (citations omitted).

c. <u>*Modern bail statutes preserve the presumption of release.*</u>

Congress has twice overhauled federal bail procedure since the founding, and both times it preserved the presumption of release. The Bail Reform Act of 1966 was "the first major reform of the federal bail system since the Judiciary Act of 1789." *ODonnell v. Harris Cnty.*, 251 F. Supp. 3d 1052, 1075 (S.D. Tex. 2017), *aff'd in part, rev'd in part*, 892 F.3d 147 (5th Cir. 2018). Its stated purpose was "to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges . . . when detention serves neither the ends of justice nor the public interest." Bail Reform Act of 1966, Pub. L. No. 89-465, § 2, 80 Stat. 214, 214 (repealed 1984). The 1966

Act required (1) a presumption of release on personal recognizance unless the court found that release would not reasonably assure the defendant's appearance; (2) the option of conditional release under supervision or other terms designed to reduce the risk of flight; and (3) a prohibition on money bail where nonfinancial conditions, such as supervisory custody or restrictions on “travel . . . or place of abode,” could reasonably assure the defendant's appearance. *Id.* § 3 (adding 18 U.S.C. § 3146(a)).

Congress again revised federal bail procedures with the Bail Reform Act of 1984 (the “BRA”), enacted as part of the Comprehensive Crime Control Act of 1984. *See* Bail Reform Act of 1984, 98 Stat. 1837, 1976 (codified at 18 U.S.C. §§ 3141–3150 (2012)). The Bail Reform Act of 1984 added a defendant's dangerousness to the analysis. The legislative history of the 1984 Act states that Congress wanted to “address the alarming problem of crimes committed by persons on release” and to “give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released.” S. Rep. No. 98-225, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3185.

But even the BRA permits pretrial detention only “if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions ‘will reasonably assure . . . the safety of any other person and the community.’” *Salerno*, 481 U.S. at 741 (omission in original). And the BRA “carefully limits the circumstances under which detention may be sought to the most serious of crimes.” *Id.* at 747. Under every version of federal bail law, from 1789 to today, release has been the rule, and the burden of

persuasion to justify detention has rested with the government, not the accused. *See Quartermaine*, 913 F.2d at 915–16. Even when there is a rebuttable presumption under § 3142(e), the government carries the burden of persuasion. *See id*. at 916 ("Once the statutory presumptions are raised, the defendant carries the burden of production to come forward with evidence to rebut the presumptions. The defendant's obligation to come forward with evidence does not shift to the defendant the government's burden of persuasion.").

d. *Wright confirms that extradition courts may set bail.*

By its terms, the Bail Reform Act applies only to a person charged with an "offense," defined as a criminal offense "in violation of an Act of Congress" and "triable in any court established by Act of Congress." 18 U.S.C. §§ 3142(a), 3156(a)(2). In 1903, the Supreme Court likewise observed that "there is no statute providing for admission to bail in cases of foreign extradition." *Wright*, 190 U.S. at 62. Yet the Court refused to hold that federal courts lacked power to admit extraditees to bail in the absence of such a statute. *Id.* at 63. The best explanation for that holding is that the power to set bail is inherent in a court's authority over a person seized for criminal prosecution, which is exactly what an extraditee is. It follows that an extraditee, like every other person arrested on criminal charges in this country, should be *presumptively* entitled to release on reasonable conditions.

That the Tates were arrested under 18 U.S.C. § 3184 rather than 18 U.S.C. § 3041 should make no difference. Both statutes authorize the arrest of a person accused of a crime only after a showing of probable cause. Neither Andrew nor Tristan is accused of a capital

offense. Thus, had they been arrested on a domestic charge, the government would bear the burden of proving that no condition or combination of conditions could reasonably assure their appearance and the safety of the community. The fact that the charges are pending in a foreign nation should not reverse that burden.

As explained in detail below, modern federal courts are capable of fashioning conditions of release that will ensure the United States' ability to comply with its treaty obligations, the only interest currently justifying the heavy presumption against bond in extradition cases. Consistent with this country's strong tradition favoring bail in criminal cases, federal extradition courts, like federal criminal courts, should presume that bail is the norm, not the exception.

**Count II: *Wright v. Henkel* has been misinterpreted for 123 years as imposing a strong presumption against bail.**

The Supreme Court has addressed whether and under what circumstances extradition courts can set bail only once, in *Wright v. Henkel*. In that case, the United Kingdom argued that, because the extradition statute did not mention bail, extradition courts lacked power to set bail. The Court rejected the claim unanimously and confirmed that courts had the power to set bail in extradition cases:

> We are unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief.

190 U.S. at 63.

But this passage has come to be universally misunderstood by extradition courts as having created a strong presumption against bail. And the phrase "special circumstances" has become an arbitrary standard that extraditees are burdened to meet. *See Parretti v. United States*, 143 F.3d 508, 512 (9th Cir. 1998) ("As to the bail issue, the government relies on cryptic language in an ambiguous case written by the Supreme Court almost 100 years ago for its argument that an almost irrebuttable presumption against bail exists in extradition cases.") (Reinhardt, J., dissenting). Very few succeed. As discussed *infra*, no consensus understanding of the phrase has developed in 123 years. As a result, whether an extraditee is conditionally released is unpredictable and arbitrary.

This reading of *Wright* is wrong. In *Wright*, the U.K. had argued that extradition courts had no power to set bail because the bail statute at that time only permitted courts to set bail in cases alleging domestic charges. The Supreme Court agreed that the bail statutes' scope was limited to domestic cases, but was "unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute." 190 U.S. at 63. The Supreme Court affirmed the denial of bail only because granting bail was not appropriate for petitioner Wright based on the record, *not because the court lacked the power to do so*. This is clear from the rest of the paragraph in which the problematic phrase "special circumstances" appears:

> We are unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute .... *Nor are we called upon to do so*, as we are clearly of opinion, on this record, that no error was committed in refusing to admit to bail, and that, although the refusal was put on the ground of want of power, the final order ought not to be disturbed.

*Id*. at 63 (emphasis added).

The holding means that extradition courts should take reasonable steps, after considering all the circumstances, to ensure that the United States can surrender the extraditee if the court certifies that it is lawful to do so. 190 U.S. at 62. In fact, the unanimous decision went to pains *not* to set a high bar against bail. The Court recognized, by rejecting the U.K.'s argument for a total bar on bail, that setting bail was theoretically, even if not always practically, permissible. In that context, the reference to "special circumstances" is best read to mean the opposite of what courts have taken it to mean: it *should* be interpreted to mean circumstances *that will reasonably assure the extradition court that the extraditee is not a flight risk—thus minimizing the risk of diplomatic embarrassment.* In such cases, extradition courts can set bail, not just theoretically but *actually*. The *Wright* Court was careful to allow for the possibility that measures short of preventive incarceration could, in some cases, reasonably assure that the extraditee would not flee. This is similar to a criminal court's duty to release a defendant pre-trial, "conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack,* 342 U.S. at 4.

Today's extradition courts—like our criminal courts—can ensure the accused's continued presence without incarceration. Federal courts now have the capability to monitor a person's whereabouts electronically, reliably, and in real time. The U.S. Marshals Service is able to respond instantaneously at any time of the day or night to any sign of a problem. International and domestic travel is regulated and surveilled. International

communication is instantaneous, allowing for coordinated law enforcement worldwide. The movement of assets is tracked and can be blocked. Consumer transactions are monitored as they occur. Telephone and other communications can be intercepted.

None of this technology was imaginable in 1903. Today, it is easy for courts to impose conditions of release that make bail jumping exponentially more difficult than it was in 1903, but courts refuse to exercise their authority and constitutional obligation to set bail. This is despite the fact that the Supreme Court was careful enough to allow that such "special circumstances" might arise, one way or another, and allow the extradition courts to set bail. But rather than using the tools at their disposal, extradition courts have clung to an improper reading of *Wright*, resulting in an unjust, unprincipled, and arbitrary jurisprudence that keeps American citizens—who are presumed innocent—in jail even when there is no rational or practical reason for it.

Several courts across the country have recognized this injustice: One extradition court concluded that denying bail to a doctor who was a lawful permanent resident in Texas was inhumane and unwarranted, notwithstanding the supposed presumption:

> Nothing beyond the naked presumption for detention counsels the court to keep Dr. Ramnath confined with the customary contingent of "crackheads," crazies, and miscreants who usually inhabit dank county jails. On the other hand, every rational concern augurs for her release. Her husband and minor children need their wife and mother. ... She is not a risk of flight.

*United States v. Ramnath*, 533 F. Supp. 2d 662, 685 (E.D. Tex. 2008).

And in *In re Extradition of Garcia*, Magistrate Judge Hacker keenly identified the illogical nature of the special circumstances doctrine as applied to a defendant who poses no flight risk or public danger:

> This Court recognizes that flight risk is a crucial factor in determining whether a potential extraditee should be detained or released on bond. Nonetheless, this Court also recognizes that treating flight risk, as the majority of district courts do, as a separate and independent inquiry could be problematic. *That is, treating flight risk as an independent factor from the special circumstances inquiry could, in theory, lead to absurd results. It is illogical to have a test where a potential extraditee can pose no risk of flight, but is required to be detained because of the lack of a so-called 'special circumstance.'*

761 F. Supp. 2d 468, 473 (S.D. Tex. 2010) (emphasis added).

*Wright* holds only that the extradition court should be mindful of the United States' diplomatic obligations in determining whether release on bail is reasonable. The decision purposely and unanimously created room for the law to develop as times and circumstances changed. These interests would be met by applying the same framework for bail in domestic criminal cases to bail in extradition proceedings.

In sum, if the Tates' appearance at the extradition proceedings can be reasonably well-assured short of incarceration, there is no reason or legal authority for confining them to FDC-Miami.

**Count III: Applying the presumption against bail violates the Eighth Amendment's Excessive Bail Clause because it presumes that the total denial of bail is the norm and that the extraditee has the burden of establishing the right to bail.**

The Eighth Amendment to the United States Constitution provides:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The Eighth Amendment's prohibition on requiring "excessive bail" creates a presumption in favor of bail. The Clause does not create an absolute right to bail, but "the command of the Eighth Amendment that 'Excessive Bail shall not be required ...' at the very least obligates judges passing upon the right to bail to deny such relief only for the strongest of reasons." *Sellers v. United States*, 89 S. Ct. 36, 38 (1968) (Black, J., in chambers) (emphasis in original). The Supreme Court's decision in *United States v. Salerno*, which affirmed the constitutionality of the Bail Reform Act of 1984, is consistent with Justice Black's understanding of the Bail Clause. 481 U.S. at 753. The Bail Reform Act generally burdens the prosecution with proving that bail should be denied by showing that a defendant is a risk of flight or danger to the community. *See* 18 U.S.C. § 3142(f); *Salerno*, 481 U.S. at 750-52.

But federal courts have interpreted *Wright v. Henkel* as burdening the extraditee with proving that there is no risk of flight or danger to the community *and* that there are "special circumstances" to justify bail. *See Wright,* 190 U.S. at 62; *Garcia*, 761 F. Supp. 2d at 474 ("There is general agreement that the potential extraditee bears the burden of establishing a bond is warranted."). The special circumstances test has been interpreted as creating a presumption against bail in an international extradition case, which runs contrary to the presumption that favors bail in domestic prosecutions. *Garcia*, 761 F. Supp. 2d at 470 (citations omitted). The government's interest in denying bail stems from its need to ensure that the United States fulfills its international treaty obligations. *Id.*; *see Wright*, 190 U.S.

at 62. The extradition treaties create binding obligations on the United States government to surrender fugitives to its treaty partners once they are found to be extraditable; thus, the government asks for detention in every case to prevent the flight of the extraditee. *Garcia*, 761 F. Supp. 2d at 470

The Supreme Court has held that "when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more." *Salerno*, 481 U.S. at 754–55 (citing *Stack v. Boyle*, 342 U.S. 1). Certainly here there are conditions of release that will ensure the Tates' appearance and their ultimate surrender to U.K. authorities if Magistrate Judge Louis so orders. But this was not sufficient because Magistrate Judge Louis found that the Tates did not meet *their burden to prove a negative,* either by a preponderance of the evidence or clear and convincing evidence, that they do not pose a risk of flight or a danger to the community, and they could not show unspecified "special circumstances." 26-mj-03260-LFL, DE 64, p. 14; 26-mj-03259-LFL, DE 66, p. 14. Imposing this undefined and unattainable burden on the Tates constitutes "excessive bail" within the meaning of the Bail Clause.

Under the Constitution, the Court should not place the burden of proof on the Tates at all. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755. Yet, Magistrate Judge Louis deemed bail in extradition proceedings as "the carefully limited exception," not the "norm." And although the United States' compliance with its treaty obligations is a compelling interest, its actions in reviewing a request for extradition are still subject to the constraints of the

Constitution. *Martin,* 993 F.2d at 829. The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations. *Id.*; *Geisser v. United States,* 513 F.2d 862, 869 n. 11 (5th Cir. 1975) (citing *Reid v. Covert,* 354 U.S. 1 (1957)); *In re Petition of Geisser,* 627 F.2d 745, 750 (5th Cir. 1980); *see also In re Extradition of Burt,* 737 F.2d 1477, 1484 (7th Cir. 1984); *Plaster v. United States,* 720 F.2d 340, 348 (4th Cir. 1983). Constitutional liberty interests should not be discounted solely because the Tates are facing a foreign extradition rather than a domestic criminal trial.

**Count IV: Applying a presumption against bail violates the Fifth Amendment's Due Process Clause because the presumption is applied arbitrarily and there are no intelligible standards or criteria governing how it may be rebutted.**

The Fifth Amendment to the United States Constitution provides in pertinent part:

> No person shall ... be deprived of life, liberty, or property, without due process of law ....

U.S. Const. amend. V.

Although bail may be granted under "special circumstances," the term has not been precisely defined. *Matter of Extradition of Rangel Prentt*, 2024 WL 2219823, at *10-11 (S.D. Fla. May 7, 2024). As observed by Magistrate Judge Matthewman, "There is little statutory guidance on the issue of bond or release pending future proceedings in extradition matters." *In re Extradition of Shaw*, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015). "The Bail Reform Act does not apply to extradition proceedings. As such, federal district courts have almost exclusively, and by necessity, developed a federal common law to fill in the gaps left by current legislation for bail determinations in foreign extradition cases. This lack of guidance has created contradictory, and often irreconcilable, lower court opinions

on the subject of bail availability for defendants facing international extradition." *Id.* (cleaned up).

Over the last 123 years, no discernible legal standards or criteria have developed to inform the "special circumstances" analysis: "What exactly constitutes 'special circumstances' has yet to be defined. Courts have only described this concept in the abstract, leaving trial courts without specific factors or parameters to follow." *Id*. at *6. Many extraditees, including Andrew and Tristan—who pose no risk of flight—are detained. Conversely, in some cases, courts have found "special circumstances" that would seem to undermine the case for release. *See, e.g., In re Extradition of Kirby*, 106 F.3d 855, 864–65 (9th Cir. 1996) (finding that "special circumstance" warranted bail because the extraditees, members of the Irish Republican Army, "enjoy the sympathy and are objects of concern of many Americans"). The result is an arbitrary application of the "test" that denies extraditees due process in their bail determination.

Extradition courts across the country have opined on the unfairness of the "special circumstances" test. For example, in *Garcia*, Magistrate Judge Hacker wrote:

> A review of the relevant case law most certainly demonstrates that what constitutes special circumstances is anything but clear. "Special circumstances" have never been specifically defined, but have only been described in the abstract, leaving trial courts with little to no guidance. Thus, bail decisions are contradictory and irreconcilable. *See, e.g.,* Nathaniel A. Persily, *International Extradition and the Right to Bail*, 34 Stan. J. Int'l L. 407, 426 (Summer 1998) ("The case law regarding the criteria for pretrial release in extradition cases has been, to say the least, inconsistent."); Christopher S. Kelly, Bail in International Extraditions: How the "Special Circumstances" Standard has Become "Especially Confusing," 21 DCBA Brief 34, 36 (March 2009) ("The cases are replete with contradictory and irreconcilable decisions, which only serve to further confuse the courts and

> muddy the law."); Joshua J. Fougere, *Let's Try This Again: Reassessing the Right to Bail in Cases of International Extradition*, 42 Colum. J.L. & Soc. Probs. 177, 188 (Winter 2008) ("There is not one consistent legitimate special circumstance that warrants release on bail.").
>
> Multiple factors have led to this convoluted "special circumstances" standard. First, as discussed above, there is no clear authority on the issue of bail in international extradition proceedings. Second, it is not uncommon for defense attorneys to present a myriad of special circumstances in support of their client's bail application. This tactic results in courts considering, and recognizing or rejecting, more circumstances as "special."
>
> Third, there are very few circuit court bail decisions providing guidance to the lower courts. This is because the bail decision quickly becomes moot.
>
> Fourth, because circuit court decisions are scarce, the vast majority of bail opinions in international extradition cases are by magistrate and district court judges. These opinions hold no precedential value and are merely illustrative.

*Garcia*, 761 F. Supp. 2d at 471–72 (footnotes and some citations omitted).

As explained in further detail, *infra*, the instant case reflects the problems illuminated by Judge Hacker. Magistrate Judge Louis, in addition to requiring the Tates to carry the burden of proof that they pose no risk of flight nor danger to the community, rejected the myriad special circumstances advanced by the Tates in support of bail, holding that prior extradition courts' decisions precluded consideration of any of them. But in denying the special circumstances, she did not define what kind of special circumstance *would* justify bail. 26-mj-03260-LFL, DE 64, pp. 14-30; 26-mj-03259-LFL, DE 66, pp. 14-30. And many of the factors advanced by the Tates have been recognized as warranting release on bond depending on the other circumstances set forth in the case. *See generally* 26-mj-03260-LFL, DE 23, DE 44; 26-mj-03259-LFL, DE 24, DE 44. Magistrate Judge Louis's analysis as a whole reflects the unpredictability of the extradition court's approach

to bail and demonstrates that the "special circumstances" test is arbitrary and untethered to what should be the core concerns of any bail determination—that the extraditee will not flee or pose a danger to the community.

A minority of extradition courts have recognized that the "special circumstances" analysis is not helpful. They have understood *Wright's* essential point—*i.e.*, that extradition courts should be mindful of the consequences of flight in extradition cases. An extradition court in the District of Massachusetts, for example, stated: "The standard of scrutiny and concern exercised ... in an extradition case should be greater than in the typical bail situation, given the delicate nature of international relations. But one of the basic questions facing a district judge in either situation is whether, under all the circumstances, the petitioner is likely to return to court when directed to do so." *Beaulieu v. Hartigan*, 430 F. Supp. 915, 917 (D. Mass. 1977); *see also In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1026 (D. Haw. 2006) ("More recent cases in the Ninth Circuit also indicate the increasing importance of the flight risk determination. This primary threshold consideration becomes more crucial with the diminishing importance of the secondary 'special circumstances' determination."); *Garcia*, 761 F. Supp. 2d at 473 ("[T]reating flight risk as an independent factor from the special circumstances inquiry could, in theory, lead to absurd results…").

However, as the *Garcia* court pointed out, these decisions lack any precedential value. Consequently, the illegitimate presumption against bail continues to prevent the release of most extraditees. For extraditees and their counsel, the lack of standards makes

preparing a bail presentation an exercise in guesswork. Even when a "strong case" for bail is presented, like here, an extradition court can find a wealth of authority to support the denial of bail based on nothing more than *Wright's* presumption. That is what happened in this case, where the Tates, accused of no crimes on American soil, were required to meet an impossible burden, by demonstrating, by either a preponderance of the evidence or clear and convincing evidence, that they posed neither a flight risk nor a danger to the community, and that special circumstances required release. This Court can and should correct this injustice.

**Count V: Applying a presumption against bail violates the Fifth Amendment's Due Process Clause by disregarding the presumption of innocence.**

The presumption of innocence, even in the face of serious allegations, is fundamental and constitutional: "'Axiomatic and elementary,' the presumption of innocence 'lies at the foundation of our criminal law.'" *Nelson v. Colorado*, 581 U.S. 128, 135-36 (2017) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). Accordingly, the Bail Reform Act expressly acknowledges the presumption, *see* 18 U.S.C. § 3142(j), and generally burdens the prosecution with proving that bail should be denied.

In extradition cases, however, the federal courts have interpreted *Wright* as burdening the extraditee with proving that there is no risk of flight or danger *and* that unspecified "special circumstances" justify bail. *See Garcia*, 761 F. Supp. 2d at 474 ("There is general agreement that the potential extraditee bears the burden of establishing a bond is warranted."). The burden the extradition court imposed on the Tates was so high that not even their strong case for bail could meet it.

There is no agreement as to the weight of *Wright*'s purported burden, but Judge Matthewman held that the extraditee bears the burden of establishing by clear and convincing evidence that he or she is not a risk of flight, is not a danger to the community, and further, that "special circumstances" exist that warrant his or her release, because in extradition proceedings, "bond is to be rare" and "the heightened burden of clear and convincing evidence is the sounder approach." *Rangel Prentt*, 2024 WL 2219823, at *13 (citations omitted). Other courts have held that a preponderance of the evidence standard applies. *See In re Shaw,* 2015 WL 521183, at *6; *Garcia*, 761 F. Supp. 2d at 474 ("[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy, which adds to the uncertainty of making a bond determination."). The majority of extradition courts either do not specify a burden or require proof of entitlement to bail by clear and convincing evidence. *Id.* (collecting cases).

But in this case, regardless of the weight of the burden, the presumption proved essentially irrebuttable. Had the government borne the burden of proving that the Tates were a risk of flight or a danger to the community, it could not have carried that burden, and the Tates would have been entitled to bail. This is clear from Magistrate Judge Louis's Order, where she noted that the parties "offered competing proof" of the Tates' proclivity for flight. She detailed the Tates' "primary argument for release . . . that they have demonstrated a perfect track record of compliance with conditions of release imposed by the Romanian court system, contrary to the Government's argument that Respondents have the incentive and financial means to flee" and described the significant evidence set forth

by the Tates at the bail hearing, including their own testimony, as to their access to wealth, hyperbolic online personas, significant family ties, extensive international travel, and continued compliance with Romanian authorities. 26-mj-03260-LFL, DE 64, pp. 7-12; 26-mj-03259-LFL, DE 66, pp. 7-12.

Yet, in the Court's words, even "[a]ccepting as true that Respondents' family-facing personae differ from their social media personalities," the Tates *still* could not meet "their burden to show, whether by clear and convincing evidence or by a preponderance of the evidence, that they do not pose a risk of flight." *Id*.

As to danger to the community, the Court noted that the Tates put forth Ms. Sesai's testimony that Andrew has not treated her abusively, and that both Andrew and Tristan are loving caregivers to their families, and relied on their unblemished track record of compliance with the conditions of supervised release imposed upon them by Romanian courts. *Id*., p. 13. Yet the Court pointed to competing evidence set forth by the government that the Tates were accused of "witness tampering" in Romania, even though the Tates explained at the hearing that they "had merely offered to pay for the travel and visiting expenses of women identified as victims of the alleged acts in Romania." *Id*. at 14. Based on this record, the Court found that the Tates failed to show they do not pose a danger to the community. *Id*.

The Court itself acknowledged that the Tates produced evidence at the hearing contesting all of the government's assertions regarding flight and danger. Especially in light of the fact that this country has treated bail as the norm since before the founding, where

there is competing evidence, courts should defer to the "traditional right to freedom before conviction." *Stack*, 342 U.S. at 4 (1951). And yet, Magistrate Judge Louis relied on an impossible standard to keep the Tates detained, despite the fact that on this record, it would be practical to fashion bond conditions that all but guarantee the Tates' appearance and their surrender to U.K. authorities.

The detention order thus violated the presumption of innocence. "Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack*, 342 U.S. at 4.

**Count VI: The Magistrate Judge erred by finding that the Tates failed to meet their burden to demonstrate that they do not present a risk of flight or danger to the community, or that special circumstances warrant their release.**

Even if the Court agrees that *Wright's* strong presumption against bond and requirement of "special circumstances" pass constitutional muster, it should still order the Tates released on bond because Andrew and Tristan have more than met the burden (whether by clear and convincing evidence or a preponderance of the evidence) to show that they are not a risk of flight or a danger to the community and there are many special circumstances in this case warranting their release.

*a. The Tates are not a flight risk.*

First, the Magistrate Judge erred by finding that the Tates did not carry their burden to demonstrate that they are not a risk of flight. 26-mj-03260-LFL, DE 64, p. 14; 26-mj-03259-LFL, DE 66, p. 14. The government offered only examples of online hyperbole to support its position that the Tates pose a flight risk. In response, the Tates set forth

affirmative evidence that they will not flee and have every incentive to cooperate with conditions of release. First, they have always cooperated with authorities and have *never* fled from a criminal investigation. *See* August 20, 2026, declaration of attorney Joseph McBride, attached as **Exhibit 8**.

Second, Andrew and Tristan have known about the charges pending against them in the United Kingdom since 2024, and they know that after their Romanian case is resolved, they will be surrendered to the U.K. by the Romanians.

Third, they have returned to Romania whenever requested by Romanian authorities, even after Romania lifted the travel restrictions against the Tates.

Fourth, the Tates' social media personalities and posts touting their wealth are exaggerated for dramatic effect. Andrew's girlfriend, Natasha Sesai, and Andrew and Tristan all testified at the detention hearing to this effect. 26-mj-03260-LFL, DE 64; 26-mj-03259-LFL, DE 66.

Fifth, both Andrew and Tristan testified that they are devoted family men who provide for their children. *Id*.

Sixth, both brothers have a significant social media following, as well as immense public visibility and recognizability, making flight almost impossible.

Finally, the government could not identify any *actual* instances of evasion or non-compliance. Counsel McBride has physical custody of all five of Andrew and Tristan's passports (U.S. and U.K. passports for both brothers, and a Vanuatu passport for Andrew) and will surrender them to Pretrial Services should the Court set a bond. The record instead

shows the opposite: years of appearances, compliance, voluntary returns to Romania, and public disclosure of their whereabouts. In the bail posture, where the Tates have never been convicted of any crime, whether here or abroad, speculation about what the Tates might do should not outweigh what they have actually done.

This Court should find that on this record, the Tates have met their burden to show they do not present a risk of flight.

*b.* *The Tates are not a danger to the community.*

Magistrate Judge Louis also found that the Tates failed to show that they do not pose a danger to the community. 26-mj-03260-LFL, DE 64, p. 14; 26-mj-03259-LFL, DE 66, p. 14. Relying on *In the Matter of the Extradition of Bell*, Magistrate Judge Louis based her finding solely on the "nature of the offenses alleged." 2021 WL 1616127, at *7 (S.D. Fla. Apr. 26, 2021). But this case is different from *Bell*: Bell left the United Kingdom on a flight to Miami less than one month after the offense was reported, and then refused to return, which the court read as "the avoidance of prosecution." *Id.* Here, the Tates have no criminal record, have demonstrated years of compliance with judicial supervision, and are not "refusing" to return to the U.K.

Moreover, highlighting the arbitrary nature of bail in extradition cases, in *Rangel Prentt*, also decided by Judge Matthewman, the Court considered whether to detain an American citizen whose extradition was being sought by Colombia. Although Judge Matthewman ultimately decided to detain the extraditee (after finding he presented a risk of flight), Judge Matthewman found that the extraditee did not pose a danger to the

community where the only evidence of danger was the instant offense and the extraditee had no criminal history (other than charges relating to domestic battery, which were eventually dismissed). 2024 WL 2219823, at *14 ("other than the underlying Colombian conviction, there is nothing demonstrating that Defendant remains a current danger to the community.").

If this were not enough to carry their burden, the Tates also presented evidence that they are not dangerous. First, the allegations underpinning the extradition proceeding are about a decade old. Second, Andrew's girlfriend, Ms. Sesai, described both Andrew and Tristan as loving and present parents who are very attached to their children, and testified that Andrew had never treated her or his children abusively. *See* 26-mj-03260-LFL, DE 64; 26-mj-03259-LFL, DE 66; DE 70.

Finally, as to the allegations that Andrew and Tristan engaged in "witness tampering" in Romania, there are no allegations that the Tates threatened or harmed any witness. Instead, the so-called "witnesses" that the Tates allegedly bribed are women who knew the Tates and wanted to speak on the brothers' behalf, but could not afford to travel to Bucharest to give statements to the authorities. The Tates helped coordinate their travel so that the women could speak with the authorities or hired legal counsel for them. At the hearing, the Tates provided the Court with recorded videos of women described by the Romanian government as victims explaining that they are not victims at all. 26-mj-03260-LFL, DE 66; 26-mj-03259-LFL, DE 68; DE 69. There were no allegations that the Tates personally threatened any witness, directed anyone to threaten a witness, or engaged in

violence against a witness. Nor was any witness identified who was actually intimidated by either Andrew or Tristan. At most, the government relied on allegations that third parties sent threatening messages online, but it offered no evidence of those messages.

This Court should find that the Tates do not present a danger to the community.

*c. <u>There are multiple special circumstances that warrant release in this case.</u>*

The following "special circumstances," considered separately or in combination, warrant Andrew and Tristan's release in this case: (1) the Romanian Surrender Orders; (2) the delay in prosecution; (3) availability of bond in the United Kingdom; (4) the absence of urgency; (5) the Tates' public visibility and recognizability; (6) the Tates' compliance with Romanian conditions of release; (7) lack of probable cause; (8) the conditions of the Tates' confinement in the SHU and the length of the proceedings; and (9) pending proceedings in Palm Beach County and Romania. Although the magistrate court rejected these factors as special circumstances, case law demonstrates that they can and should apply in this case. In **Appendix 1**, undersigned counsel have collected 40 cases where courts have found special circumstances and granted bond pending extradition proceedings.

***The Romanian Surrender Orders***

The driving force regarding bail in extradition proceedings is the "overriding national interest in [the United States] complying with treaty obligations" and the need to avoid the "diplomatic embarrassment" that would result if the United States were to release a fugitive pending extradition and the defendant absconded. *Wright*, 190 U.S. at 62; *United*

*States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990). Thus, where "there is a lack of any diplomatic necessity for denying bail," courts have found special circumstances. *Chapman*, 459 F. Supp. 2d at 1026–28.

No diplomatic necessity exists here because the U.K. already obtained a surrender order from Romania based on the same warrants that are before the extradition court. The U.K. is using the United States to bypass the Romanian proceedings and deny Romania its right to hold a trial and impose any sentence that may result. In short, the U.K. is trying to jump the line.

Also, despite seeking a provisional arrest, which is available under Article 12 of the treaty in an "urgent situation," the government's submissions omit the fact that the Tates had been on pretrial release for more than three years, had complied with all the conditions of that release, and were in the United States under the authority and judicial supervision of the Romanian courts. Further, the government failed to disclose a written prosecutorial finding in Romania that there were no plausible grounds to believe the brothers would flee, and a judicial finding that they are not a risk of flight. *See* **Ex. 1,** p. 4; **Ex. 2,** p. 4.

These omissions are especially egregious because the Tates came to and remained in the United States with the Romanian government's authorization. The Tate brothers did not flee Romania or come to the United States (a country with an extradition treaty with the U.K.) to avoid a future surrender to the U.K. As the government conceded in its complaint, upon arriving in the U.S., the Tates posted pictures of themselves in

Washington, D.C. and Andrew publicly announced his agreement to host a boxing match in Miami.

The U.K.'s access to the Tate brothers does not depend on their detention by this Court. A standing order already provides that Romania will surrender the Tates to the U.K. once the Romanian proceedings close. The Court has three years of a proven record of the brothers' compliance with bail conditions, including nearly a year and a half (starting in February 2025) of international travel with the brothers returning to Romania as required. In sum, there is no diplomatic necessity for detention in this case, and the Tates' release on conditions, including surrendering passports, 24/7 GPS monitoring, and other conditions this Court deems necessary, preserves the United States' treaty obligations and protects against any diplomatic concerns.

***Delay and Availability of Bond in the U.K.***

There are other "special" reasons to allow a bond here. When a requesting country significantly delays seeking extradition, the diplomatic necessity for detention is reduced. In *Chapman*, for example, a relevant factor in allowing bail was that Mexico had waited three years before bringing extradition proceedings and had "not made prosecution of this offense a priority," instead "wait[ing] three years before bringing extradition proceedings against the [defendants], during which [time the defendants] were living openly and notoriously, aware of the charges against them in Mexico." 459 F. Supp. 2d at 1027.

The U.K. sought the extradition of the Tates in 2024 after obtaining a warrant for their arrest, but the charges stem from conduct that occurred almost a decade before the

warrant was signed. The complainants did not report the allegations to authorities until at least 2022. In addition, any diplomatic concern arising from a U.S. court's decision to grant bail is substantially diminished where the requesting nation (the U.K.) permits bail in extradition proceedings. *See Taitz*, 130 F.R.D. at 446 ("Certainly, there can be no diplomatic concern by South Africa if a United States court releases on bail a person who is facing extradition to South Africa where bail is available in South Africa for persons facing extradition to the United States."); *United States v. Kollmar*, No. 19-MJ-70677-MAG-1 (KAW), 2019 WL 2163005, at *2-5 (N.D. Cal. May 17, 2019) ("Finally, the Court finds that the fact that Canada would grant bail to defendants facing extradition for similar offenses is a special circumstance"); *Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1221 (D. Nev. 1993) ("Nacif has established by clear and convincing evidence that bail would be available in Mexico on the underlying substantive offense, and that this constitutes a 'special circumstance.'"); *but see Matter of Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1298-99 (S.D. Fla. 2017) (availability of bail in Panama was not a special circumstance).

In the U.K., the governing rule is a "presumption in favour" of bail if the defendant has not yet been convicted, subject to conditions designed to mitigate any risk of flight.[3] *See* Ex. 5, ¶¶ 20-21. Likewise, in the U.K., rape is a bailable offense.[4] *Id*. at ¶ 23. Therefore,

[3] www.cps.gov.uk/prosecution-guidance/extradition-uk#a02
[4] www.legislation.gov.uk/ukpga/1994/33/section/25

in the reciprocal situation, a defendant in the U.K. whose extradition was being sought by the United States for rape would be entitled to a presumption in favor of bail.

***There Was No "Urgent Situation" Justifying the Brothers' Provisional Arrest, and None Justifies Their Continued Detention***

The U.S. / U.K. extradition treaty authorizes provisional arrest "[i]n an urgent situation." Treaty art. 12(1). Neither the government's sworn complaint nor its detention memorandum identifies any facts constituting an "urgent situation" justifying the provisional arrest of the Tate brothers. To the contrary, the government's allegations run the other way. The complaints note the U.K. warrants were issued more than two years before the brothers' arrest in Miami on July 18, 2026, and concern conduct that allegedly occurred about a decade before that. Leading up to the Miami arrest, the government was tracking the brothers and their social media accounts and knew exactly where they were. 26-mj-03260-LFL, DE 3; 26-mj-03259-LFL, DE 3, ¶¶ 7(g), 9 ("On July 17, 2026, authorities observed TATE in Miami, Florida").

There was no basis for the government proceeding provisionally other than a single conclusory allegation that the brothers "would likely flee if [they] learned of the existence of a warrant for [their] arrest." *Id.,* ¶ 11. This claim is *ipse dixit*, and the government's detention memorandum refutes it. The memorandum concedes that the brothers had "been aware of the charges" for some time (and did not flee). From March 2024, the Tates' English solicitors corresponded directly with the Officer in the Case at Bedfordshire Police and with the Crown Prosecution Service about these very charges. **Ex. 5,** ¶ 12. On August 29, 2025, the Tates commenced judicial review against the Director of Public Prosecutions.

**Ex. 5**, ¶ 15. Four days before the Miami arrest, the brothers publicly posted their exact location: the United States Capitol. 26-mj-03260-LFL, DE 3; 26-mj-03259-LFL, DE 3, ¶ 7(g). Under the circumstances, the brothers' documented public life undermines the premise of urgency for a provisional arrest.

A summary of the Tates' social media activity is attached as **Exhibit 9**. It shows that throughout the 31 months preceding their Miami arrest (January 2024 through July 2026), the Tates maintained an unbroken public presence. Andrew's video channel published in every one of those 31 months without exception—633 uploads total. **Ex. 9**, Parts I, III.

From December 14, 2025, through July 17, 2026—the last full day before the arrests, a span of 216 consecutive days—Andrew posted publicly on X on all 216 days, without a single silent day; Tristan posted on 214 of those same 216 days. **Ex. 9,** Parts I, IV. The Director of Public Prosecutions himself described the brothers as "notorious" in correspondence dated March 7, 2025. R (Tate) v. Dir. of Pub. Prosecutions [2026] EWHC 1600 (Admin) [17], [41] (Eng.). That characterization is corroborated by independent measurement: YouGov's quarterly ratings for the second quarter of 2026 place Andrew Tate among the three most widely recognized internet personalities measured in the United States. **Ex. 9**, Part VI.

The brothers' February 2025 arrival in Florida was publicly announced. *See* Andrew Tate, Brother Arrive in Florida from Romania, NPR (Feb. 27, 2025), www.npr.org/2025/02/27/nx-s1-5311621/andrew-tate-brothers-romania-florida.

The following charts demonstrate this prolific social media activity:




*Figure 1. Items published on Andrew Tate's video channel, by month, January 2024 – July 2026. No month is zero. Ex. 9, Part III.*




*Figure 2. Days on which each brother published at least one post on X, December 14, 2025 – July 17, 2026. A filled square marks a day on which a post was published. Ex. 9, Part IV.*

In March 2025, the brothers flew voluntarily to Romania to satisfy a reporting condition of their pretrial release, *see* Influencer Brothers Andrew and Tristan Tate Return to Romania After Weeks in U.S., CBS News (Mar. 22, 2025), https://www.cbsnews.com/news/andrew-tate-tristan-leave-united-states-return-to-romania/; Andrew and Tristan Tate Check In at Police Station in Romania, Complying with Judicial Measures, Associated Press (Mar. 24, 2025), https://www.ksat.com/news/world/2025/03/24/andrew-and-tristan-tate-check-in-at-police-station-in-romania-complying-with-judicial-measures/.

The brothers' public presence was matched by a record of documented compliance with the release conditions imposed on them. When Romanian judicial control required it, the brothers flew back from Florida (or elsewhere in the world) to Romania and reported. Twenty-five days before their Miami arrest, the Tates' counsel appeared before the High Court of Justice in London to pursue a judicial review proceeding against the Director of Public Prosecutions. **Ex. 5**, ¶ 15.

Indeed, ordinary (non-urgent) process has worked successfully with the brothers. More than two years ago, the Bucharest Court of Appeal received the January 19, 2024, Westminster warrants that the government offers for the brothers' provisional arrest. As described above, the Bucharest court executed the U.K. warrants on March 12, 2024, granted the U.K.'s request for surrender of the brothers, postponed surrender pending conclusion of the Romanian proceedings, and released the brothers on conditions.

In this way, the U.K. obtained, through ordinary channels, everything it asked Romania to provide, including an order of surrender of the Tate brothers. The U.K.'s claim that those same U.K. warrants required urgent execution by provisional arrest in the United States has no support.

There was no "urgent situation" justifying the brothers' provisional arrest, and there is none justifying their continued detention. The absence of a genuine exigency, together with a documented record of appearance and compliance spanning years and jurisdictions, contributes to the special circumstances warranting release on conditions.

***Full Compliance with Romania's Conditions of Release***

There is no greater "special" circumstance than the Tates' demonstrated compliance with Romania's conditions of release for more than three years.

The brothers spent 1,193 days under Romanian conditions: detention, then house arrest, then judicial supervision. *See generally* Vidineac Decls., **Ex. 3; Ex. 4**. In February 2025, the lead prosecutor, after determining the Tates strictly complied with all obligations of the preventive measures, found there was no risk the Tates would evade the criminal proceedings or otherwise obstruct the administration of justice. The prosecutor issued an order in both criminal cases (file nos. 1305 and 2557) removing the travel restrictions on the Tates and permitting them to leave Romania. **Ex. 1; Ex. 2.** The 1305 Order states:

> As can be observed, the defendants TATE Andrew and Tristan have been under the preventive measure of judicial control since 04.08.2023. The obligations attached to both preventive measures were fully complied with, the defendants demonstrating respect for all the obligations imposed during the nearly 1 year and 6 months of preventive measures restrictive of liberty and rights.
>
> Likewise, the defendants TATE Andrew and Tristan are American and British citizens, and during the period of over 1 year and 6 months in which they were subject to preventive measures, they interrupted all ties with their states of citizenship and with the family members located in those states. Therefore, they suffered a significant restriction in the exercise of the right to private and family life, which is why it is considered that such a restriction no longer finds an objective justification, given that the defendants, for over 2 years, rigorously complied with all the obligations imposed.
>
> At the same time, having regard to the conduct of the defendants TATE Andrew and Tristan in the two files in which they are being investigated, in concrete terms, it is considered that there are no plausible reasons to consider that they would have any intention of evading criminal prosecution and trial; on the contrary, they have constantly demonstrated interest in the correct establishment of the facts and the resolution of the present file.

> Therefore, I consider that the admission of the present request would not affect the proper conduct of the criminal proceedings, given that the defendants TATE Andrew and Tristan remain subject to the other obligations attached to the preventive measure. Thus, their appearance at the summonses of the judicial bodies and at the police body designated for their supervision would ensure their participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective in ensuring the establishment of the truth in the case.

**Ex. 1,** pp. 8-9.

Similarly, in the 2557 Order, the Court noted:

> At the same time, having regard to the conduct of the defendant Andrew TATE within the two files in which he is being investigated, concretely, it is considered that there are no plausible reasons to consider that he would have the intention to evade the criminal prosecution and the trial; on the contrary, he has constantly demonstrated an interest in the correct establishment of the facts and the resolution of the present file.
>
> Therefore, I consider that admitting the present request would not affect the proper course of the criminal proceedings, given that the defendant Andrew Tate remains subject to the other obligations attached to the preventive measure. Thus, his appearance at the summonses of the judicial bodies and at the police body designated for supervision would ensure his participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective for ensuring the ascertainment of the truth in the case.

**Ex. 2,** p. 4.

After these Orders, the Tates left Romania and traveled the world, but continued to report to Romanian authorities as required without incident.

The Tates' continued compliance in the face of Romanian and U.K. charges could not be clearer or more convincing evidence that they will not flee. Courts have considered a defendant's demonstrated compliance to be a special circumstance. For example, in *In re Extradition of Bowey*, the court in the Northern District of Georgia held that Bowey's

"previous conduct in this case is another factor showing that special circumstances exist." 147 F. Supp. 2d 1365, 1368 (N.D. Ga. 2001) ("This is not the extreme case where a parent abducts the children, takes them to a non-treaty country, and eliminates all contact with the other parent. Rather, Mr. Bowey returned home to Georgia in order to file for divorce and have a court determine custody of the children. His actions show that he is accepting responsibility rather than avoiding it.").

***Lack of Probable Cause, Harsh Conditions of Confinement, and Anticipated Length of Proceedings***

Due process requires the Tates' release because they are being held in highly restrictive conditions of confinement without probable cause for an indefinite period of time. As Judge Matthewman held in *Shaw*: "[i]n an appropriate case, where a review of the record establishes there is a complete lack of probable cause supporting the charges in the foreign country, due process would likely require the release [on bond] of a defendant in a foreign extradition proceeding." 2015 WL 521183, at *7.

Probable cause requires a showing of reliable evidence that a crime was committed and that the accused committed it. The U.K. has submitted allegations that were not reported to authorities until several years after the alleged conduct, after the Complainants saw "in the media" that the Tates were being investigated. No complainant went to the police until more than six years after the last conduct alleged against her:

- Complainant 1: alleged conduct occurred in 2012, 2013, and 2016; did not contact police until January 2023. 26-mj-03260-LFL, DE 68-1, pp. 48; 65 ¶ 31; 26-mj-03259-LFL, DE 72-1, pp. 51 ¶ 32.

- Complainant 2: alleged conduct occurred in 2015; did not contact police until August 2022. 26-mj-03260-LFL, DE 68-1, pp. 48; 74 ¶ 55.
- Complainant 3: alleged conduct occurred in 2014 and 2015; did not contact police until January 2023. 26-mj-03260-LFL, DE 68-1, pp. 49; 84 ¶ 82.
- Complainant 4: alleged conduct occurred in 2010; did not contact police until September 2025. 26-mj-03259-LFL, DE 72-1, pp. 41–42; 70 ¶ 90.
- Complainant 5: alleged conduct occurred in 2015 and 2016; was contacted by police February 2025. 26-mj-03260-LFL, DE 68-1, pp. 52; 102 ¶ 139.
- Complainant 6: alleged conduct occurred in 2016 and 2017; was contacted by police in January 2025. 26-mj-03260-LFL, DE 68-1, pp. 52–53; p. 111 ¶ 162.
- Complainant 7: alleged conduct occurred 2011, 2012, 2017; was contacted by police in March 2025. 26-mj-03260-LFL, DE 68-1, pp. 51; 92 ¶ 105.

Not one of the Complainants went to the police while their relationship with Tristan or Andrew was ongoing. The last alleged conduct occurred on August 18, 2017. 26-mj-03260-LFL, DE 68-1, p. 51; 26-mj-03259-LFL, DE 72-1, p. 43. And the first police contact was years later, in August 2022. 26-mj-03260-LFL, DE 68-1, pp. 74 ¶ 55.

Complainants 1, 3, 5, and 6 each admit that sex within her relationship with Andrew or Tristan was consensual in whole or in part. 26-mj-03260-LFL, DE 68-1, pp. 85 ¶ 87; 87 ¶ 91; 104 ¶ 143; 105 ¶ 145; 107 ¶ 150; 113 ¶ 167; 26-mj-03259-LFL, DE 72-1, pp. 52 ¶¶ 33–34; 58 ¶ 53.

As to Complainants 5, 6, and 7 in the Formal Requests for Extradition, the police solicited information from them—the Complainants did not report to the police. 26-mj-03260-LFL, DE 68-1, pp. 102 ¶ 139; 111 ¶ 162; 92 ¶ 105; 26-mj-03259-LFL, DE 72-1, pp.

80 ¶ 120; 84 ¶ 132; 91 ¶ 156. And Complainants 1 and 3 did not come forward until they learned about the Romanian case. 26-mj-03260-LFL, DE 68-1, pp. 65 ¶ 31; 84 ¶ 82.

Importantly, an element of rape under Section 1 of the U.K.'s Sexual Offences Act 2003 is that the defendant "does not reasonably believe" there is consent. The U.K's extradition package indicates the parties engaged in consensual, rough sexual activity. *See, e.g.*, 26-mj-03259-LFL, DE 72-1, p. 52 ¶ 34; 26-mj-03260-LFL, DE 68-1, p. 88 ¶ 87. This point raises substantial questions about the accusers' credibility and motivation and whether the alleged conduct was criminal. In particular, the U.K. contends Tristan and his accuser were in a relationship from April 2012 to December 2013, that Tristan sexually assaulted her in 2012, but that this accuser continued having a relationship with Tristan, and even after breaking up with him, reconnected with Tristan in 2016 and "travelled on two occasions to work in webcam businesses operated" by Andrew and Tristan. *Id.*, p. 55 ¶ 40. Tristan's reasonable belief that his romantic partner consented to all of their sexual activity would be a complete defense to the charges against him.

The Tates have already spent 80 days incarcerated without seeing any evidence to purportedly support their extradition, and the official request for extradition was only filed two days ago on October 5, 2026. Several courts have considered the provisional warrant situation in the special circumstances calculus. *See, e.g., Matter of Extradition of Molnar*, 182 F. Supp. 2d 684, 687-89 (N.D. Ill. 2002) (following "a more liberal view in determining

bail" as the extradition was "under a provisional arrest and there was no urgency to his apprehension and incarceration").[5]

Courts have also found the projected length of the extradition proceedings may constitute a special circumstance when extensive investigation will be required to challenge probable cause. *See, e.g.*, *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 60-61 (D. Mass. 2010) (finding undue delay a special circumstance where defendant "has made it clear that he intends to challenge the Government's showing of probable cause," evidence beyond the charges would have to be translated, and years of immigration proceedings would have to be reviewed); *Chapman*, 459 F. Supp. 2d at 1027 (finding a "high probability of delay in the extradition proceedings" a special circumstance, because the underlying offense occurred more than three years ago and "it may be difficult to track down witnesses and prepare evidence for the hearing"); *In re Extradition of Morales*, 906 F. Supp. 1368, 1375 (S.D. Cal. 1995) (finding the likelihood of delay to constitute a special circumstance because government had filed a new complaint resulting in several months of delay, and there were "a number of factual and legal issues to be researched, briefed, heard, and resolved," including a challenge to the government's showing of probable cause); *Taitz*,

[5] On Westlaw, there is an indication that this February 1, 2002 Order was stayed and the defendant was detained on March 18, 2002. Undersigned counsel pulled the docket sheet on PACER, and it appears that statement is inaccurate—the Order was stayed on February 11, 2002 and the defendant was detained, but the court held another bond hearing on March 4 and 5, 2002 and issued an order granting bail and setting conditions of release. *See* Case No. 1:02-mc-00005 (N.D. Ill.), DE 36.

130 F.R.D. at 445-46 (granting bail where "[i]f this court were to decide the extradition request today, the various district and circuit court proceedings would likely last for as long as two years. Taitz would have to be incarcerated during this lengthy period.").

The fact that the brothers are being held in administrative segregation at FDC-Miami makes this point more compelling. Without any disciplinary sanctions, the Tates are in the SHU as a protective measure solely because of their notoriety. A pretrial detainee "may not be punished at all." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Holding a pretrial detainee in segregation, under conditions harsher than those imposed on convicted prisoners, without individualized justification and without the periodic reviews the Bureau of Prisons' own regulations require, violates due process. *See Magluta v. Samples*, 375 F.3d 1269, 1273-74, 1279-80 (11th Cir. 2004); 28 C.F.R. § 541.26. FDC Miami has denied counsel's written request for non-SHU housing.

*Matter of Extradition of Toledo Manrique* is squarely on point: the Tates have not yet been convicted of *any crime*, and yet remain subject to this severe restraint on their liberty. 2019 WL 5168587, at *1 (N.D. Cal. Oct. 10, 2019). According to a supervisory attorney at the Bureau of Prisons, Andrew and Tristan are segregated from general population subject to the following conditions while detained in the SHU:

1. Only five hours per week of recreation (less than one hour per day);
2. Only one phone call per month (rather than the routine access to a phone and 300 minutes per month allocated to inmates in general population);
3. Limited commissary items with access only once every two weeks; and
4. No television.

These conditions are strikingly similar to those in *Toledo Manrique,* where, as the government acknowledged, Toledo was held in "'a small cell for all but an hour of every two days,' about which a staff psychiatrist at the jail opined had caused a decline in the fugitive's mental health." 2019 WL 5168587, at *2. Toledo had been held in solitary confinement for nearly three months at the Santa Rita Jail due to his status as a former head of state and his request for protective custody. *Id.* He was confined "to a small cell for all but an hour of every two days," and the staff psychiatrist opined that detention under those conditions had "already initiated a marked decline in Toledo's mental health." *Id.* And, like the Tates, "Toledo's detention [was] likely to continue unabated for many months, if not years, in light of the anticipated length of extradition proceedings." *Id.*

The government made the same argument in *Toledo* that "jail administrators are 'accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order'" and therefore "if the government's entitlement to detain a person is not at issue, a court cannot order release to remedy unlawful conditions of confinement outside of narrowly cabined circumstances." *Id*. But the court was not "question[ing] the Santa Rita Jail's decision to place Toledo in administrative segregation." *Id*. Instead, the court was considering whether to continue "detention in solitary confinement or release on bail." *Id*. In granting bail, the *Toledo* court concluded: "in this context the hardship of detention is one factor among many that can justify release . . . indeed *Bell* (which is the primary authority on which the government relies) referred to bail hearings as a safeguard that can mitigate restrictive conditions of

pretrial detention." *Id*. (citing *Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981); *United States v. Taitz,* 130 F.R.D. 442, 446 (S.D. Cal. 1990); and *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).

It is antithetical to our justice system for United States citizens with no criminal history, accused of committing crimes based on ambiguous statements by complainants, to sit in administrative segregation while they fight the unfounded charges against them, of which they are presumed innocent under our Constitution. They have not been convicted of any crime, here or abroad, nor have they received a single disciplinary infraction, and yet they are subject to some of the most restrictive conditions of confinement in this country. They face no charge in any American court and are held solely at the request of a foreign government—even further removed from anyone the law permits to punish. The Tates' months-long detention in administrative segregation based solely on unsupported, anonymous allegations at the provisional stage (before the U.K. submitted its formal extradition request) is fundamentally inconsistent with due process.

***The Tates' Extraordinary Public Visibility***

The Tates' extraordinary notoriety and recognizability are also a special circumstance. As a practical matter, it would be extraordinarily difficult for Andrew or Tristan to travel undetected or avoid attention, either from the press or law enforcement.

The Tates are among the most recognizable public figures on the internet with a massive social media following. Andrew has more than ten million followers on X and was the third-most Googled person in the world in 2023. Tristan has more than three million

followers on X. Their content generates billions of views across multiple platforms, including more than 20 billion views associated with the hashtag #AndrewTate on TikTok. Before their detention, both Andrew and Tristan routinely publicized their whereabouts on social media, often posting real-time updates of their locations. *See* **Ex. 9**. Their activities are the subject of constant public scrutiny, media coverage, and online discussion.

In particular, from January 2024 through their arrest on July 18, 2026, the Tates operated under their own names on several social media accounts that they have held since 2011 and 2013, published their own movements in real time, and appeared at pre-announced ticketed events. Their work is built around public posts and appearances. Indeed, when Deputy U.S. Marshals were sent to take the Tates into custody, the marshals did not have to search but instead attended a publicly advertised boxing match in downtown Miami where the Tates were scheduled to appear.

In another celebrity case, *In re Extradition of Chapman*, a magistrate judge released Duane Lee Chapman, also known as Dog the Bounty Hunter, on bond because he was a "visible, well-known public figure[] who could not easily go into hiding" and was not a risk of flight. 459 F. Supp. 2d at 1027. Chapman's show, Dog the Bounty Hunter, was the most popular show on A&E, attracted millions of viewers each week, and was highly lucrative for Chapman. *Id*. at 1025.

The *Chapman* court's reasoning applies with full force. Unlike most extradition cases, millions of followers, media outlets, and critics around the world continuously monitor the Tates' identities, appearance, travel patterns, business activities, and public

statements. The Tates' public visibility substantially reduces any risk that they could abscond or evade detection.

***The Tates Have a Strong Interest in the Civil Litigation in Palm Beach County and Romania***

Andrew and Tristan Tate are the plaintiffs in the Palm Beach County action against a Florida resident who had accused both men of sexual assault and human trafficking. *Tate v. Doe*, No. 2023-CA-011904-XXXX-MB. In *In re Mitchell*, Judge Learned Hand held that an extraditee's participation in a civil proceeding underway at the time of his arrest was a special circumstance warranting bail under *Wright v. Henkel,* because his "whole fortune" depended on the litigation. 171 F. 289, 290 (S.D.N.Y. 1909). Here, more than money is on the line. The Tates' reputation depends on this litigation. The accuser's claims are directly related to the charges in Romania. The Palm Beach action is the only forum in which these accusations have been litigated, and Judge Curley has dismissed six of the seven counterclaims. Judge Curley found no criminal enterprise, no pattern of criminal activity, and "at most emotional damages." *See* October 23, 2025 Order, *Tate v. Doe*, Case No. 2023-CA-011904-XXXX-MB, attached as **Exhibit 10.**

In *In re Extradition of Bowey*, a court held that there was a special circumstance where "releasing Mr. Bowey on bail would allow him to participate in the divorce proceedings in Cobb County Superior Court" that were "directly related to the reasons for his extradition and the resolution of the issues in that matter could directly affect the prosecution of the charges he faces in France." 147 F. Supp. 2d at 1368; *see also Matter of Extradition of Vladimir Blasko to the Slovak Republic*, 2018 WL 3691859, at *10 (E.D.

Cal. Aug. 1, 2018) ("Blasko's pending asylum case and the imminent merits hearing on his application for asylum constitutes a special circumstance weighing in favor of the setting of bail in this action" where "Blasko's preparation for and participation in the merits hearing [was] 'immediately necessary.'"). The fact that the Tates have spent years on this litigation to clear their name is clear and convincing evidence that they are unlikely to flee and abandon their pending civil claims in the United States.

Additionally, the Tates are prejudiced in the Romanian proceedings by their continued detention. On August 31, 2026, Romanian prosecutors filed a new indictment against Andrew and Tristan. Although FDC has been accommodating in allowing the brothers to meet with their Romanian attorney via videoconference, it is exceedingly difficult for Romanian counsel to meaningfully work with Andrew and Tristan to adequately prepare to defend the charges against them while Andrew and Tristan are detained in the SHU. *See* Declaration of Romanian criminal defense counsel, Eugen Constantin Vidineac, addressing the status of the Romanian proceedings and the prejudice the brothers suffer as a result of their continued detention, attached as **Exhibit 11.**

***Cumulative Effect***

"Special circumstances can arise under a variety of conditions, or by virtue of a combination of conditions that taken together create a compelling case for release on bail." *Rangel Prentt*, 2024 WL 2219823, at *17 (citations omitted). The cumulative effect of all of the above special circumstances, including the fact that the Tates are not a risk of flight, warrants Andrew and Tristan's release on reasonable conditions of bond. *See United States*

*v. Bowman*, 2020 WL 835342, at *7 (S.D. Cal. Feb. 20, 2020) (Even though the Court has determined that delay in prosecution alone stands as a "special circumstance" in this case sufficient to justify setting bail, the Court notes that if delay were not enough standing alone, the Court would find that it is sufficient when considered in combination with other factors); *see In re Extradition of Morales*, 906 F. Supp. at 1373 ("[T]he cumulation of several factors can constitute special circumstances that justify bail in extradition proceedings.").

**Conclusion**

The heavy presumption against bail that applies in every extradition case is unconstitutional. Because extradition proceedings are essentially probable cause determinations, they are criminal in nature, and the government, not the extraditee, should bear the burden of showing that the extraditee must remain in detention. Under this framework, the Tates should be released on reasonable conditions of release.

Moreover, there is a plethora of special circumstances in this case warranting the release on bond of Andrew and Tristan Tate, United States citizens with no criminal history who have presented substantial evidence to show they pose neither a risk of flight nor a danger to the community. The denial of bail in this case is therefore without lawful basis. They are entitled to release on bail forthwith on conditions that will reasonably ensure their appearance at all proceedings.

## Prayer for Relief

WHEREFORE, for the reasons set forth in this Petition and in light of the grave constitutional and legal errors identified, Petitioners EMORY ANDREW TATE and TRISTAN TATE respectfully request that this Court:

1. **Grant Habeas Corpus Relief**: Issue a Writ of Habeas Corpus directing the immediate release of EMORY ANDREW TATE and TRISTAN TATE from custody, on reasonable bond conditions, as their detention is unlawful based on the deficiencies and errors in the detention proceedings.
2. **Vacate the Detention Order:** Vacate the Order remanding Andrew and Tristan to custody issued by Magistrate Judge Louis based on the improper application of legal standards.
3. **Provide Further Relief as Justice Requires**: Grant any further relief that this Court deems just and proper under the circumstances to ensure the Petitioners' rights are fully protected and any remaining legal issues are appropriately addressed.

Respectfully submitted,

*/s/ Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 407-1005
tamaniotis@equitylegalfirm.com
Counsel for Petitioners

*/s/ Joseph D. McBride*
**JOSEPH D. MCBRIDE**
New York Bar No. 5445879
THE MCBRIDE LAW FIRM, PLLC
305 Broadway, Suite 700
New York, New York 10007
(917) 757-9537
jmcbride@mcbridelawnyc.com
Co-Counsel for Petitioners

/s/ *Howard Srebnick*
*s/ Alexa Klein*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)
BLACK SREBNICK
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

HSrebnick@RoyBlack.com
JPerczek@RoyBlack.com
AKlein@RoyBlack.com
JGoldman@RoyBlack.com

/s/ *Stephen James Binhak*
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICES OF STEPHEN JAMES BINHAK
One Southeast Third Avenue, Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com