**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-cv-27049-DAMIAN**

**EMORY ANDREW TATE,** and
**TRISTAN TATE,**

**Petitioners,**

**vs.**

**TODD BLANCHE,**
United States Attorney General,

**MARCO RUBIO,**
United States Secretary of State,

**PRISCILLA PEREZ LOPEZ,**
United States Marshal for the
Southern District of Florida, and

**E.K. CARLTON,**
Warden, Federal Detention Center-
Miami,

**Respondents.**
______________________________________/

**RESPONSE IN OPPOSITION TO EMORY ANDREW TATE'S AND TRISTAN TATE'S PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioners Emory Andrew Tate ("A. Tate") and Tristan Tate ("T. Tate") (collectively "Petitioners") are currently detained in connection with ongoing extradition proceedings that the United States initiated at the request of the United Kingdom ("U.K.").[1] The instant petition for a

[1] Record citations to events concerning the instant habeas petition are denoted as "ECF No. #," in addition to the documents and transcripts attached hereto as exhibits (referred herein as "*Ex.*"). Record citations to the events in T. Tate's extradition proceedings are denoted as "T.T. EXT DE #" and reference the docket in the Southern District of Florida Case Number 26-mj-03259-Louis.

writ of habeas corpus follows a decision from U.S. Magistrate Judge Lauren Louis ("the extradition court") denying Petitioners' request for release from custody pending the completion of their extradition proceedings. The extradition court got it right, and the Court should reach the same conclusion that bail is not warranted. Specifically, the Court should deny the petition because the legal standard to obtain bail in extradition proceedings is not unconstitutional as Petitioners allege, and Petitioners are not eligible for bail under either the current standard or the one they propose—that the Government bear the burden to prove that Petitioners are a flight risk and that they are dangers to the community without Petitioners having to establish special circumstances.

Having failed to satisfy the longstanding special circumstances requirement before the extradition court, Petitioners are making the extraordinary request that this Court exercise authority it does not have and be the first to buck more than 120 years of precedent and fundamentally change how extradition proceedings are conducted. They do this all while ignoring the vital foreign relations component that is present only in extradition cases. The need to preserve reciprocal and diplomatic relationships with foreign partners is why court after court has applied the same heighted bail standard in extradition cases. Put another way, the well-reasoned standard is not unconstitutional merely because Petitioners think it is unfair.

In any event, the premise of Petitioners' constitutional arguments is wrong and does not support their claims. Petitioners spend a significant amount of time trying to convince the Court that extradition proceedings are akin to criminal proceedings and should therefore apply the same bail standards. But again, Petitioners are asking the Court to reject universally established law that extradition proceedings are not criminal proceedings because they have fundamentally different

---

Record citations to events in A. Tate's extradition proceedings are denoted as "A.T. EXT DE #" and reference Southern District of Florida Case Number 26-mj-03260-Louis.

objectives, which Petitioners largely ignore. Because of the foreign policy connection, requiring that international fugitives meet the additional criterion of special circumstances is not excessive punishment under the Eighth Amendment. Additionally, Petitioners' contention that requiring proof of special circumstances violates their Fifth Amendment rights fails because the term "special circumstances" is not arbitrary nor impossible to apply simply because it requires an individualized analysis. Plus, to the extent Petitioners argue that a presumption of detention in extradition proceedings damages their entitlement to a presumption of innocence, their argument is unfounded because detention does not confer guilt.

Finally, whether applying the current Supreme Court and Eleventh Circuit standard or Petitioners' novel proposed standard for bail, Petitioners should remain in custody for the duration of their extradition proceedings. Setting aside that Petitioners leave out of their habeas petition the most damaging findings from the extradition court's detention decision, Petitioners are charged with very serious crimes that render them dangers to the community, and as demonstrated through the record evidence and Petitioners' testimony, they are unmitigable flight risks. Their recycled, unsuccessful arguments on special circumstances should fare no better in this Court. The Court should therefore deny Petitioners' habeas petition.

## BACKGROUND

### I. PENDING FOREIGN CHARGES AGAINST PETITIONERS

The United States will be pursuing certification of extradition on thirty-nine (39) offenses against A. Tate and seventeen (17) offenses against T. Tate.[2] A.T. EXT DE 68-1 at 155-156; T.T. EXT DE 72-1 at 100. For both Petitioners, an initial set of charges are the subject of arrest warrants

[2] The charges sought for certification of extradition are as follows:

- Human trafficking in violation of Sections 2(1) and 5(1) of the Modern Slavery Act 2015 (five counts against both Petitioners);

issued on January 19, 2024, and the remaining charges are the subject of warrants issued on August 5, 2026. T.T. EXT DE 72-1 at 32-36; A.T. EXT DE 68-1 at 34-45.

In addition to the U.K. charges referenced above, Petitioners are also facing numerous charges in Romania.[3] *Ex. 2*. After criminal proceedings commenced in Romania, Romania initiated extradition proceedings against Petitioners on March 12, 2024, at the request of the United Kingdom, for charges lodged in the January 2024 warrants. ECF Nos. 1-6, 1-7. Romania promptly granted the U.K.'s requests for extradition over Petitioners' objections. *See id*. Pursuant to Romanian law, the Romanian court postponed Petitioners' surrender to the United Kingdom until after the conclusion of its criminal case. ECF Nos. 1-6 at 9; 1-7 at 10. Petitioners have not returned to the United Kingdom despite permission to travel freely under the conditions set in the Romanian case. *See Ex. 22*.

By letters dated July 23, 2026, and July 27, 2026, Romanian authorities informed the United States that Petitioners have consistently appeared in Romania for judicial proceedings as

---

- Rape in violation of Section 1 of the Sexual Offenses Act 2003 (ten counts against A. Tate, five counts against T. Tate);
- Assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861 (seven counts against A. Tate, six counts against T. Tate);
- Assault by penetration in violation of Section 2 of the Sexual Assault Offenses Act 2003 (one count against T. Tate);
- Controlling prostitution for gain in violation of Section 53 of the Sexual Offenses Act 2003 (one count against A. Tate);
- Distributing indecent photographs of a child in violation of Section 1(1)(b) of the Protection of Children Act 1978 (five counts against A. Tate);
- Making indecent photographs of a child in violation of Section 1(1)(a) of the Protection of Children Act 1978 (seven counts against A. Tate); and
- Possession of extreme pornographic images in violation of Sections 63(1), 7(d), and 67(3) of the Criminal Justice and Immigration Act 2008 (four counts against A. Tate).

[3] Those charges include creating an organized crime group, human trafficking, money laundering, witness intimidation against both Petitioners, and charges of rape, sexual intercourse with a minor, and trafficking in minors for A. Tate. *Ex. 2*.

ordered, but Petitioners "took steps to influence victims' statements" in 2023 and 2024, while they were in pretrial detention and under judicial supervision. *Ex. 2* at 3; *Ex. 3* at 5. On July 3, 2026, authorities announced new charges against Petitioners.[4]

## II. PROCEDURAL HISTORY IN THE UNITED STATES

The United States, in response to requests from the United Kingdom and pursuant to its statutory and treaty obligations to the United Kingdom,[5] filed complaints and obtained warrants for Petitioners' provisional arrests with a view toward extradition. EXT DE 3 (both dockets). Petitioners were provisionally arrested on July 18, 2026, and in compliance with the Treaty, the United Kingdom submitted its formal extradition requests for both Petitioners on September 9, 2026. T.T. EXT DE 72; A.T. EXT DE 68.

On August 7, 2026, Petitioners filed motions for release from custody, T.T. EXT DE 24; A.T. EXT DE 23, and following briefing from both parties, the extradition court held a seven-hour joint detention hearing on August 27, 2026, T.T. EXT DE 53; A.T. EXT DE 52. Both Petitioners,

---

[4] A. Tate was charged with "influencing or attempting to influence seven victims with the aim of inducing them to make false statements, to refrain from making any statements, or to retract their statements." In the case of T. Tate, "it was found that, between August 2023-May 2024, he influenced or attempted to influence a total of twelve victims under the same circumstances." *Ex. 2* at 6-7.

[5] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc. No. 108-23 (2004), and related Exchanges of Letters, *as amended by* the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006), with Annex reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

their U.K. lawyer Andrew Ford, and A. Tate's girlfriend Natasha Sesai[6] testified at the hearing. *Id.* On September 9, 2026, the extradition court denied Petitioners' request for bail upon concluding that Petitioners failed to bear their burden of proving they are not flight risks, they are not dangers to the community, and that special circumstances warranted their release. T.T. EXT DE 66; A.T. EXT DE 64.

In evaluating flight risk, the extradition court focused its assessment on Petitioners' means and incentives to flee, as well as Petitioners' ties to the District, propensity to engage in extensive international travel, and the use of aliases. A.T. EXT DE 64 at 9.[7] The court found several inconsistencies between Petitioners' testimony or written briefing and evidence submitted by the Government, including the following:

- Petitioners' claim to have exaggerated their true wealth online was contradicted by Ms. Sesai's testimony that Petitioners were able to generously fund their eleven children's lives even after Romania seized and froze their assets, A.T. EXT DE 64 at 9-10;
- A travel log Petitioners submitted to establish their international travel (*Ex. 22*) was "incomplete on its face," causing the extradition court to conclude that "the precise frequency with which [Petitioners] fly, together or separately, and where, remains elusive," A.T. EXT DE 64 at 10;
- A. Tate "vehemently" disavowed a then-Twitter account (@ofWudan) that posted several videos of A. Tate seemingly bragging about and recommending having multiple identification documents from different countries to help evade law enforcement (*Ex. 21* at 160-62, 166-67), which was contradicted by an interview in which A. Tate t followers that they could reach him at the @ofWudan account, A.T. EXT DE 64 at 10-12; and
- T. Tate first claimed in his pleading that a Mexican passport in the name of "Vladimir Scorpius," which bore T. Tate's photograph and birthdate (*Ex. 15*), was created as part of a Halloween costume, he later testifying under oath that an assistant printed it for him (*Ex. 21* at 122), but neither statement was able to resolve how the purportedly fake passport

[6] The transcript of the detention hearing spells the witness' last name as Sesay, while Petitioners' habeas petition repeatedly refers to the witness as Ms. Sesai. *See* ECF No. 1 at 15, 40, 42, 44. Respondents will use the Petitioners' spelling in this pleading.

[7] From this point forward, references to the extradition court's decision on bond will only be referenced using the docket entry number for A. Tate's extradition matter. As mentioned above, the extradition court's decision appears in T. Tate's matter at Docket Entry 66.

contained a real "CURP" number that obtained through an official Mexican government's website, A.T. EXT DE 64 at 12 (referencing *Ex. 15a-b*).

The Court concluded that these contradictions[8] lessened any probative value of Petitioners' assertions, and therefore, Petitioners failed to meet their burden of proving that they do not pose a risk of flight. A.T. EXT DE 64 at 13.

The extradition court further found that Petitioners were a danger to the community based, in part, on the nature of the offenses with which Petitioners are charged in the United Kingdom. *Id.* at 13. The Court acknowledged Ms. Sesai's testimony that A. Tate had not abused her or their child, but did not find it particularly probative of whether A. Tate was a danger to the community. *Id.* Instead, the extradition court credited the Government's rebuttal that Petitioners did not have as clean of a track record with compliance in the Romanian proceedings as they had claimed. *See id.* at 13-14. In particular, the court found compelling evidence from Romania indicating that Petitioners had been charged with new witness tampering offenses while they under judicial supervision in Romania. *Id.* While Petitioners attempted to explain away the charges by claiming that they "had merely offered to pay for the travel and visiting expenses of women identified as victims of the alleged acts in Romania," the Court questioned the wisdom of any contact with the witnesses and determined that the legality of that conduct was for the Romanian courts to decide and therefore insufficient to prove lack of dangerousness. *Id.*

Lastly, the extradition court rejected a lengthy list of alleged special circumstances that Petitioners had presented, including the following:

- The U.K. warrant and complaint were not supported by probable cause;

---

[8] Of note, Petitioners' make no mention in their habeas petition of the @ofWudan account or the Mexican passport in T. Tate's possession, let alone the contradictions surrounding them, even though those inconsistencies formed a critical part of the extradition court's conclusion that Petitioners lacked credibility about whether they are flight risks. *See generally* ECF No. 1.

- The U.K. improperly sought Petitioners' extraditions from the United States when the U.K. already had an extradition order from Romania;
- There was no urgency supporting the Petitioners' provisional arrests;
- The U.K. delayed in seeking their provisional arrest and extradition;
- The offenses with which Petitioners are charged are bailable offenses in the U.K.;
- Petitioners' "extraordinary public visibility" was necessary for their livelihood and prevented them from being able to go into hiding;
- Extradition proceedings would take a significant amount of time to complete;
- Petitioners are subject to dire conditions of confinement; and
- Petitioners need to participate in other court proceedings that require access to counsel in the U.S. and abroad.

For the aforementioned reasons, the Court concluded that bail was not warranted because Petitioners did not meet their burden, either by clear and convincing evidence or a preponderance of the evidence, to establish they are not flight risks, that they are not dangers to the community, and that special circumstances existed. A.T. EXT DE 64.

Petitioners subsequently filed this habeas petition reiterating their arguments for release.

## **ARGUMENT**

### I. STANDARD OF REVIEW

Neither this Court nor the Eleventh Circuit has directly addressed the standard of review for this precise scenario—a habeas petition filed to challenge an extradition court's detention order.[9] However, decisions from within the Eleventh Circuit and this Court have appeared to apply de novo review without addressing why. *See*, *e.g.*, *Matter of Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280 (S.D. Fla. 2017); *In re Extradition of Bowey*, 147 F. Supp. 2d 1365 (N.D. Ga. 2001). The Government presumes that a de novo standard of review applies for purposes of

[9] Some courts have reviewed an extradition court's detention decision under a "reasonable grounds" standard, *see Taylor v. McDermott*, 20-cv-11272, 2020 WL 4569693, at *3 (D. Mass. Aug. 7, 2020); *Matter of Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir. 1986), while others have reviewed extradition courts' detention decisions de novo, *see Kapoor v. Demarco*, Dkt. No. 16-cv-5834, 2025 WL 1826503, at *1 (E.D.N.Y. July 2, 2025); *United States v. Al-Nouri*, 983 F.3d 1096, 1098 (9th Cir. 2020).

this pleading.

## II. APPLICABLE LEGAL STANDARDS

Neither the Treaty nor the federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, provide for bail. Additionally, the Bail Reform Act does not govern extradition cases because the statute itself confirms it applies only to offenses in violation of U.S. law. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Rather, "[f]ederal district courts have almost exclusively, and by necessity, developed a federal common law to fill in the gaps left by current legislation for bail determinations in foreign extradition cases." *Matter of Extradition of Rangel Prentt*, Dkt. No. 24-cv-80209, 2024 WL 22119823, at *11 (S.D. Fla. May 7, 2024) (quoting *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 470 (S.D. Tex. 2010)).

For more than a century, courts have treated extradition cases differently than ordinary domestic criminal cases for purposes of granting bail. Unlike criminal cases, there is a presumption against bail in extradition cases, and the fugitive-defendant bears the burden of establishing that he or she is eligible for release.[10] *See Martin v. Warden, Atlanta Pen.,* 993 F.2d 824, 827 (11th Cir. 1993); *Rangel Prentt*, 2024 WL 2219823, at *11-12. The Supreme Court established this presumption against bail in *Wright v. Henkel*, 190 U.S. 40, 62 (1903), explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended. In

[10] There is disagreement among courts about whether a fugitive needs to establish eligibility for bail by presenting clear and convincing evidence or whether a preponderance of evidence is sufficient. *See Rangel Prentt*, 2024 WL 2219823, at *12-13 (discussing the inconsistency in bail standards and concluding that the appropriate standard should be "clear and convincing evidence"). The extradition court determined that the issue need not be resolved in this case because Petitioners failed to meet their burden under either standard. *E.g.*, A.T. EXT DE 64 at 5-6.

consideration of this presumption, case law provides that bail in extradition proceedings should be the exception and not the rule. *See United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

Accordingly, fugitives sought for extradition to a foreign country may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release.[11] *See*, *e.g.*, *Matter of Extradition of Yungman*, Dkt. No. 24-mc-61373, 2024 WL 4581265, at *2 (S.D. Fla. Oct. 25, 2024); *Martinelli Berrocal*, 263 F. Supp. 3d at 1292. While courts have not developed a consistent definition of the term "special circumstances," they consistently agree that special circumstances are "limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extradites." *Yungman*, 2024 WL 4581265, at *2 (quoting *Matter of Extradition of Bell*, Dkt. No. 21-mc-80533, 2021 WL 1616127, at *3 (S.D. Fla. Apr. 26, 2021)). Special circumstances also cannot be factors that are applicable to all potential extraditees. *In re Extradition of Shaw*, Dkt. No. 14-MC-81475, 2015 WL 521183, at *6 (S.D. Fla. Feb. 6, 2015).

Crucially, the special circumstances inquiry is separate from, and in addition to, considerations of danger and risk of flight. *See, e.g.*, *Martin*, 993 F.2d at 828 (declining to address fugitive's flight risk arguments because fugitive relied only on arguments related to flight risk and failed to show special circumstances on appeal). Thus, "[e]ven a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (lack of flight risk "is not the criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the

[11] As the extradition court noted, even the Petitioners "acknowledge[d], the requirement that the 'special circumstances' test be satisfied is supported by binding Eleventh Circuit precedent." A.T. EXT DE 64 at 6 (citing to *Martin,* 993 F.2d at 827).

community or is a flight risk should be denied bail, even in the face of special circumstances. *E.g.*, *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

## III. THE WELL-WORN STANDARD FOR BAIL IN EXTRADITION PROCEEDINGS IS CONSTITUTIONAL

Since the Supreme Court issued its 1903 decision in *Wright*, 190 U.S. at 62, the U.S. Courts of Appeals have uniformly held that fugitives must establish they are not flight risks or dangers to the community and that special circumstances justify being released from custody. *See*, *e.g.*, *Martin*, 993 F.2d at 827 n.4 ("[W]e are aware of no decision in which a federal court has departed from the legal requirement that a defendant prove "special circumstances."); *In re Extradition of Ghandtchi*, 697 F.2d 1037, 1038 (11th Cir. 1983). This requirement, which protects the foreign policy interests and treaty obligations inherent in extradition cases, has survived repeated constitutional challenges. *See*, *e.g.*, *Russell*, 805 F.2d at 1217 (rejecting Eighth Amendment challenge); *In re Extradition of Johnson*, Dkt. No. 12-mj-00065, 2012 WL 3929811, *2-4 (W.D. Pa. Sept. 7, 2012) (rejecting Eighth and Fifth Amendment challenges); *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 168 (S.D.N.Y. 2009) (rejecting Eighth Amendment challenge). Setting aside the Court's inability to give Petitioners what they want given binding precedent, the Court should reject such challenges again because Petitioners' arguments do not raise any issues that warrant the obliteration of more than 100 years of case law.

### a. <u>Extradition Proceedings are not Criminal Proceedings and Reasonably have Distinct Requirements for Bail</u>

The essential premise of Petitioners' argument is that extradition proceedings are akin to a probable cause determination in a domestic criminal case, and therefore, the same bail standards that apply in criminal cases should apply in extradition cases. *See* ECF No. 1 at 21-27. Not only

does this argument ignore the substantial case law, statutes, and rules to the contrary, it also fails to account for the unique objective of extradition proceedings.

"Extradition proceedings are not in their nature criminal, even if the relator is a criminal; extradition is not punishment for crime, though such punishment may follow extradition." *United States ex rel. Oppenheim v. Hecht,* 16 F.2d 955, 956 (2d Cir. 1927); *see also Martin*, 993 F.2d at 828. As set forth in 18 U.S.C. § 3184, the purpose of an extradition hearing is to decide the sufficiency of evidence for each charge for which extradition is requested. Unlike a domestic criminal proceeding, the objective is not to determine the guilt or innocence of the fugitive; that question is reserved for the foreign court after extradition. *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1165 (11th Cir. 2005). In other words, "what is at issue in the [extradition] proceeding . . . is not punishability but *prosecutability*." *Noeller v. Wojdylo*, 922 F.3d 797, 804 (7th Cir. 2019) (emphasis in original) (quoting *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011)).

While certain concepts from criminal law necessarily apply to determine a fugitive's extraditability, an extradition proceeding is not governed by ordinary criminal law. Indeed, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence both exclude extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); *see Afanasjev*, 418 F.3d at 1164-65. As noted above, the Bail Reform Act likewise does not apply to individuals who have been arrested solely for extradition on foreign charges. 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).

Because the purpose behind extradition proceedings significantly differs from the objective of criminal proceedings, there are strong justifications for having different standards for bail. "Individual liberties, so carefully protected in domestic criminal proceedings, sometimes must yield to paramount national interests in preserving harmonious working relations with foreign

sovereigns." *United States v. Ramnath*, 533 F. Supp.2d 662, 665 (E.D. Tex. 2008). The strong presumption against bond in extradition cases stems from the United States' "overriding foreign relations interest in complying with treaty obligations and producing extradited persons." *United States v. Hills*, 765 F. Supp. 381, 385 (E.D. Mich. 1991); *see also Garcia*, 761 F. Supp.2d at 475. The United States makes widespread use of the extradition process in other countries, so it reciprocally must honor its own treaty obligations to ensure other countries comply with its own requests. Moreover, "[n]o amount of money could answer the damage that would be sustained by the United States were the appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender." *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963).

The fact that the probable cause standard applies in both criminal and extradition proceedings does not change the propriety of applying different bail standards. *See* ECF No. 1 at 21-22. *First*, an extradition hearing is not akin to a preliminary hearing, as Petitioners suggest. *See In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1282 (S.D. Fla. 2011) (commenting that an extradition hearing is "even *more* limited in scope than a preliminary hearing" because, for example, cross-examination of government witnesses is improper in extradition proceedings) (emphasis in original). *Second*, some inclusion of criminal law concepts in extradition proceedings does not then mandate importation of all rules and standards from criminal cases, particularly because the objectives of the proceedings are different. Interestingly, Petitioners do not make any effort to justify their position considering the proceedings' different objectives. *See* ECF No. 1 at 23-27. *Third*, while criminal and extradition proceedings analyze similar issues, neither provides a fundamental right to *be granted* bail, only to pursue it. *See* ECF No. 1 at 23-24.

Lastly, if the Court accepted Petitioners' conclusion—that extradition proceedings are criminal and therefore must follow the same standards as criminal cases—the effects would go far

beyond the standard for bail. If the Court were to adopt Petitioners' (ill-founded) theory that extradition cases are criminal cases, potentially every aspect of extradition proceedings would be upended, including the restrictions on discovery, presentation of contradictory evidence, and confrontation of accusers. Such changes would turn extradition proceedings into mini-trials, or perhaps even full-blown trials, where requesting countries may be required to present underlying evidence and send witnesses to testify at extradition hearings. Courts have repeatedly cautioned that conducting extradition proceedings in this manner would be contrary to the intent behind extradition treaties. *See*, *e.g.*, *Collins*, 259 U.S. at 316; *Shaw*, 2015 WL 3442022, at *8.

**b. The Presumption Against Bail in Extradition Proceedings Complies with the Eighth Amendment**

Petitioners' assertion that the presumption against bail in extradition cases violates the Eighth Amendment's excessive bail clause is meritless. *See* ECF No. 1 at 32-34. "It is well established that the Eighth Amendment does not give a defendant an absolute right to bail." *United States v. Fernandez-Toledo*, 737 F.2d 912, 920 (11th Cir. 1984). As discussed above, there is good reason why bail requirements in extradition proceedings are distinctive.

To the extent the Eighth Amendment implies a presumption against pretrial detention in non-capital criminal cases, *e.g.*, *Stack v. Boyle*, 342 U.S. 1, 5 (1951), extradition cases are not criminal cases, as explained above. Indeed, unlike in ordinary criminal cases, the extradition treaty governs alongside the Constitution. *See Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1069 (C.D. Cal. 2017) (citing *Garcia*, 615 F. Supp. 2d at 168). And extradition treaties create obligations that relate directly to foreign policy considerations that are relevant in every extradition case. This important government interest is preserved by requiring a fugitive to meet a higher burden than a criminal defendant. *See*, *e.g.*, *Johnson*, 2012 WL 3929811, at *2; *Garcia*, 615 F. Supp. 2d at 168.

**c. The Presumption Against Bail in Extradition Proceedings Complies with the Fifth Amendment**

i. The Special Circumstances Requirement is not Unpredictable or Arbitrary

Petitioners argue that the special circumstances requirement is unconstitutional because there is no discernible standard. ECF No. 1 at 34-38. Their argument fails from the start because, as one of their own cases acknowledges, the standard, while not precise, has a "reasonably clear explication [that] was penned by Judge Learned Hand . . . [when] he opined that the court's limited power to grant bail in cases involving foreign extradition 'should be exercised only in the *most pressing circumstances,* and when the requirements of justice are *absolutely peremptory*.'" *Ramnath*, 533 F. Supp. 2d at 666 (emphasis in original) (citing *Mitchell*, 171 F. at 289).

To determine when such circumstances exist, courts engage in a case-by-case analysis using nationwide case law as the guide. *E.g.*, *In re Extradition of Mitchell*, 625 F. Supp. 3d 481, 500 (N.D. W. Va. 2022); *Garcia*, 761 F. Supp. 2d at 472. A standard that must be analyzed on a case-by-case basis is not inherently unworkable or "arbitrary." *Cf. Beckles v. United States*, 580 U.S. 256, 262-64 (2017) (holding that the Federal Sentencing Guidelines are not subject to a void-for-vagueness challenge because the guidelines still require a court to "make an individualized assessment based on the facts presented."); *see also United States v. Matchett*, 802 F.3d 1185 (11th Cir. 2015) (same). Petitioners do not cite any cases to the contrary.

Petitioners cite to a few cases that have criticized the special circumstances requirement, *see* ECF No. 1 at 28, 37, but criticism is not unconstitutionality. The cases upon which Petitioners rely are not within this circuit and demonstrate how the current bail standard in extradition cases works effectively. In two cases, the courts questioned the wisdom of the special circumstances requirement but ultimately applied it. *See Ramnath*, 533 F. Supp. 2d at 662; *Garcia*, 761 F. Supp. 2d at 473, 483. In another case, the district court granted bail because the fugitive was not a flight

risk without addressing special circumstances, *Beaulieu v. Hartigan*, 430 F. Supp. 915 (D. Mass. Mar. 14, 1977), but the First Circuit reversed and ordered the district court to reconsider bail under the special circumstances standard, *Beaulieu v. Hartigan*, 554 F.2d 1 (1st Cir. 1977). These limited cases fall far short of justifying abandonment of a century-old standard.

Finally, Petitioners appear to suggest that there is a constitutional problem because more potential extraditees are ordered detained than released and because they were denied bail specifically.[12] *See* ECF No. 1 at 28, 37-38. Rather, these are further signs that the standard is operating as intended. A fugitive sought for extradition *should* rarely be released on bail due to the foreign relations interests inherent in extradition proceedings. Further, if a defendant in a U.S. criminal case flees after being released from custody, another prosecuting authority to whom the case truly belongs would not lose its ability to pursue its case, as could happen if someone absconds during extradition proceedings. Consequently, if the United States is not a reliable partner from which to obtain extradition, foreign countries will be less likely to honor the United States' requests for extradition or other law enforcement assistance.

ii. <u>The Special Circumstances Requirement does not Disregard the Presumption of Innocence</u>

Petitioners further assert that the standard for bail in extradition cases fails to preserve the presumption of innocence by essentially removing the possibility of pretrial release. *See* ECF No. 1 at 38-40. However, Petitioners fail to explain how being held in custody for the purpose of awaiting extradition implicates the presumption of innocence. Certain criminal defendants remain detained pretrial but maintain the benefit of the presumption of innocence when they go to trial.

---

[12] Notably, Petitioners' argument that bail is rarely granted is belied by their own exhibit providing a non-exhaustive list of dozens of cases in which fugitives have been released from custody during their extradition proceedings after establishing special circumstances. *See* ECF No. 1-12.

*See Bell v. Wolfish*, 441 U.S. 520, 533 (1979) (stating that the presumption of innocence "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun"). Fugitives who are sought for prosecution, like Petitioners, may still benefit from any presumptions or benefits that are available under the requesting country's laws once extradited. Put simply, detention alone does not confer guilt.[13]

## IV. PETITIONERS ARE INELIGIBLE FOR BAIL UNDER EITHER THE CURRENT STANDARD OR THE STANDARD THEY PROPOSE

### a. Petitioners are Dangers to the Community

Petitioners further argue that this Court should release them on bond because they proved at the bond hearing that they are not a danger to the community. They claim the extradition court erred in relying on the nature of the U.K. offenses to conclude that Petitioners failed to rebut the notion they are dangerous. They further aver that the testimony of one witness, Ms. Sesai, alone carried their burden to show they are not dangerous. Finally, they posit the extradition court wrongly considered the new Romanian charges of witness tampering because no evidence showed Petitioners "threatened or harmed any witness." ECF No. 1 at 44. The record says otherwise. It clearly demonstrates the extradition court's dangerousness finding was rooted in evidence, common sense, and the proper application of relevant precedent.

The nature of Petitioners' U.K. offenses—rape and strangulation of multiple victims—undoubtedly shows dangerousness. *See Bell*, 2021 WL 1616127, at *7 (Former Chief Judge Matthewman finding a fugitive failed to prove by a preponderance of the evidence that he was not

[13] Petitioners' argument also wrongly presumes that all potential extraditees are entitled to the presumption of innocence. Extradition treaties typically permit the extradition of individuals who have already been convicted. *See* U.S.-U.K. Treaty, Art. 1 (describing agreement to extradite persons wanted for trial "or punishment").

a danger despite allegedly committing forcible rape). Petitioners are alleged to collectively have committed the forcible rapes with strangulation of seven victims who described struggling to breathe during their sexual assaults. This kind of violence is always serious. Consequently, the extradition court correctly found the alleged conduct alone made Petitioners a danger.[14]

Regardless, Petitioners entreat this Court to release them on the testimony of one witness, Ms. Sesai, but her testimony was as irrelevant on the issue of dangerousness as it was unreliable[15] as to risk of flight. She testified on direct examination that, in her experience, Petitioners were wonderful men whose online personas were nothing like their offline personalities. *Ex. 21* at 76-79. She further testified they had never been violent with her or their children. *Id.* at 73, 77, 80. However, the extradition court found Ms. Sesai's testimony about A. Tate's treatment of her and her children was not "particularly probative of whether Respondent Emory poses a danger to the community." A.T. EXT DE 64 at 13. In fact, the extradition court found the Government had

---

[14] Petitioners' claim that the extradition court's reliance on *Bell* was erroneous is not compelling. ECF No. 1 at 43-44. Judge Matthewman reached the opposite conclusion on whether a foreign offense established dangerousness in *Rangel Prentt*, 2024 WL 2219823, but this was appropriate because the under the law—including under the Bail Reform Act—a court should conduct an individualized assessment of dangerousness. *Garcia*, 761 F. Supp. 2d at 472 ("Put simply, the determination of whether a potential international extraditee has satisfied their burden to warrant bail is necessarily made on a case-by-case basis.").

[15] The extradition court found Ms. Sesai's testimony refuted many of the arguments presented by Petitioners in their bid for release. For example, on cross-examination, she admitted that A. Tate paid everything for her and their children, (*id.* at 91-92); paid for her luxury items, (*id.* at 92-93); and that there was "never any time I don't need something that I don't have it," (*id.* at 91). Thus, the extradition court reasonably concluded Ms. Sesai's testimony contradicted one of Petitioners' central flight-risk claims—that they were financially destitute.[15] *See* A.T. EXT DE 64 at 9-10; *see e.g., Ex. 21* at 116, Testimony of Tristan Tate ("Every asset I held, every dollar I made, every car I own, every piece of property is in the hands of the Romanian Government right now."); *id.* at 148, Testimony of Andrew Tate ("And, when I say everything was stolen from us [by Romanian authorities], every single thing of value, every piece of jewelry, every watch, every car, our children's toys. Every land, probably every bank they found for our mothers of our kids, for the kids, themselves. Everything was stolen.").

rebutted Petitioners' arguments of dangerousness because of their alleged witness tampering in Romania while on pretrial home confinement. *Id.* Therefore, because Ms. Sesai's testimony was irrelevant, the extradition court rightly did not rely on it in its dangerousness analysis. The Court should follow this prudent approach.

Notwithstanding their alleged violent conduct and the irrelevant testimony of Ms. Sesai, Petitioners finally argue that this Court should release them because the extradition court's consideration of the witness tampering charges was misplaced. They claim that the charges stem from when they were on pretrial release in Romania and simply tried to help the alleged female witnesses run to the judicial system, not away from it. ECF No. 1 at 44. They also argue they did not tamper with witnesses because they never threatened or harmed anyone. *Id.* at 44-45. These arguments are factually and legally incorrect.

Petitioners fail to acknowledge that there are many means by which one could commit witness tampering, even in the United States. To be sure, witness tampering can occur by threats or physical harm. *See e.g.,* 18 U.S.C. § 1512(a). Nevertheless, it can also be accomplished through other means, including bribery (*see*, *e.g.*, 18 U.S.C. § 1510); intimidation, corrupt persuasion, or misleading conduct (*see*, *e.g.*, 18 U.S.C. § 1512(b)); and intentional harassment (*see*, *e.g.*, 18 U.S.C. § 1512(d)). None of these other methods require the use of threats or physical harm, but what makes them criminal is that they seek to subvert the judicial process, either by preventing the presentation of evidence in an investigation or by causing false or altered evidence to be given.

Petitioners focus on threats of physical hard is thus improper.[16] While they do not contest they "hired legal counsel for [the witnesses]," (*see* ECF No. 1 at 44), they claim they altruistically

[16] Interestingly, Petitioners support this by mentioning there has not been "any witness identified who was actually intimidated by either Andrew or Tristan." ECF No. 1 at 44. This argument conveniently ignores that Romanian authorities have alleged that, as part of the witness tampering

helped them obtain legal representation and "coordinated…travel so these women could speak with the authorities."[17] *Id.* However, their assertions are belied by the record. Romania alleges that Petitioners did the following:

(1) "Attempted to persuade or did persuade witnesses…not to make any statements related to the case;"
(2) "Attempted to persuade or did persuade witnesses…to make false statements;"
(3) "Attempted to persuade or did persuade witnesses…to retract their previous statements;"
(4) Engaged in acts of bribery "by offering money and property to the victim;"
(5) Engaged in acts of coercion, "by threats;"
(6) Engaged in acts of coercion "by…the unauthorized disclosure to the public of documents and information regarding the private lives of the victims and their family members;"
(7) Led the victims "to believe that law enforcement agencies were exerting pressure on [the victims];"
(8) Dictated "[the victims'] statements to them;"
(9) Attempted "to influence [victims'] conduct during the proceedings;" and
(10) Interfered "with the legal representation for those summoned to hearings, specifically, by hiring defense attorneys loyal to the interests of the two defendants to assist them during the hearing proceedings."

*Ex. 3* at 5-6.

Thus, Romania claims Petitioners' consistently "took steps intended to influence the victims' statements actions" that "resulted in the impairment of freedom of expression and the

---

charges, Petitioners "manifested through threats and the unauthorized disclosure to the public of documents and information regarding the private lives of the victims and their family members," which was "**intended to expose the victims to a wave of threats and online harassment** through numerous intimidating messages, including death threats, **sent by supporters of the two defendants**. These messages significantly affected the victims' privacy, safety, and mental well-being." *Ex. 3* at 5-6 (emphasis added).

[17] Petitioners seek to rely on "recorded videos of women described by the Romanian government as victims explaining that they are not victims at all," ECF No. 1 at 44, but these statements are unpersuasive. They are unsworn and were not taken by Romanian law enforcement or a Romanian judge in an official setting. Rather, they were recorded at an unknown location at an unknown time, seemingly at the request of Petitioners. The Government posits that, given the tampering charges against Petitioners in Romania, the Court should view these statements with skepticism.

truthfulness of the statements." *Id.* This is exactly what witness tampering seeks to achieve, regardless of the method used: to influence or alter the presentation of evidence during an investigation. Thus, Petitioners' actions pose a danger to victims. *See Garcia*, 761 F. Supp. 2d at 480 ("D]anger to the community does not refer only to the risk of physical violence."); *cf. United States v. Giordano*, 370 F .Supp. 2d 1256, 1270 (S.D. Fl. 2005) (finding same under the Bail Reform Act).

As the record demonstrates, the extradition court properly based its findings on credible evidence and the correct application of the relevant case law to reach the conclusion that Petitioners are dangers to the community and therefore ineligible for release from detention. This Court should follow suit.

**b. <u>Petitioners are Unmitigable Flight Risks</u>**

The Tates are serious flight risks and fail to prove otherwise. The record establishes that, including its flight risk analysis, the extradition court properly considered Petitioners' financial means, foreign connections, ties to the United States, and incentives to flee. A.T. EXT DE 64 at 7-13; *see Martinelli Berrocal,* 263 F. Supp. 3d at 1292. In particular, as established by testimony from Petitioners and Ms. Sesai, Petitioners and their children have few ties to the Southern District of Florida. *Ex. 21* at 74, 95, 109, 178. Petitioners have also shown a propensity for avoiding the United Kingdom by publicly mocking U.K. authorities and their inability to extradite them. *See Ex. 1* at 4 (describing social media posts and videos in which A. Tate calls the United Kingdom a "joke" and "total clowns," brags about "never getting extradited," urges the United Kingdom to "come get" him in Hong Kong); *see also id.* at 3 (describing A. Tate's attempts to resolve civil litigation in the United Kingdom by unsuccessfully requesting the United Kingdom to suspend its warrant to allow him to return). This combination of lack of ties to the United States and a

tendency to publicly flaunt their absence from the United Kingdom shows how risky it would be to release Petitioners during their extradition proceedings.

As the extradition court found, the rest of the record, including testimony from the lengthy detention hearing, only provides more evidence that Petitioners are insufficiently credible to believe they would abide by any conditions of release imposed by the Court. For example, Petitioners' social media accounts paint Petitioners as extremely wealthy, international travelers with private jets, a custom $50 million superyacht, and unrestricted access to crypto currency and bitcoin. *Ex. 5*, *6*, *17, 18*. This is somewhat consistent with Ms. Sesai's testimony that Petitioners travel frequently, occasionally by private jets. *Ex. 21* at 90, 95. However, Petitioners' own testimony described a completely different financial picture that cannot be reconciled with Ms. Sesai's testimony or Petitioners' social media presence. *See id.* at 116, 148.

Relatedly, a former Twitter account, @ofWudan, posted numerous tweets featuring A. Tate excoriating foreign law enforcement authorities, celebrating efforts to obstruct criminal process, bragging of missing court dates, and making claims that the poster possesses aliases and both the means and motive to effectuate flight with considerable speed. *See Ex.* 1 at 14-31. A. Tate testified that the @ofWudan account did not belong to him, *Ex. 21* at 160-62, 166-67, but the extradition court reasonably dismissed his claim after the Government presented a video clip in which A. Tate directs the audience to contact him at the Twitter account @ofWudan. *Ex. 13.*

The extradition court also found T. Tate not credible due to testimony he provided about a Mexican passport that contained his photograph and date and place of birth. He provided two different explanations for why the passport existed. T. Tate first said in his pre-hearing pleadings that the passport was a prop for a Halloween costume (T.T. EXT DE 13), but he later testified under oath at the detention hearing that the passport was printed by an assistant (*Ex. 21* at 122).

Not only do these explanations differ, but they also do not account for the fact that the passport contains a CURP number, which is a unique identification number that only can be obtained through an official registration with a Mexican government agency. *See Ex. 15a.* T. Tate has not provided any explanation for why his fake passport would have a real identification number on it. Thus, taken together, T. Tate's statements about the Vladimir Scorpius passport still leave questions about the origins of the passport. T.T. EXT DE 66 at 12.

These discrepancies demonstrate why the extradition court reasonably questioned the credibility of Petitioners' testimony about their willingness to remain within the jurisdiction for the duration of their extradition proceedings. The Court should therefore reject Petitioners' unpersuasive attempt to prove they are not flight risks and otherwise warrant being released from custody.

**c. Petitioners are Unable to Establish Special Circumstances**

The Court may deny Petitioners' habeas petition solely for failure to prove they are not flight risks or dangers to the community. However, even if the Court were to find that Petitioners met that burden, Petitioners remain ineligible for release because they have not established any special circumstances, either individually or collectively. *Cf. Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

i. The Existence of a Romanian Extradition Order does not Support Release

Petitioners rely heavily on the fact that "the U.K. already obtained a surrender order from Romania," which they claim was based on the same warrants that are before the extradition court. ECF No. 1 at 46. Petitioners' theory is that the United Kingdom is improperly seeking to "jump

the line" in front of Romania by seeking extradition from the United States. *Id*. Petitioners fail to provide any case law supporting this argument, and it is otherwise flawed for multiple reasons.

Petitioners are incorrect that the 2024 extradition order in Romania was based on the same warrants at issue in this extradition proceeding. *Id.* After obtaining initial warrants in January 2024, the United Kingdom brought new charges against Petitioners in July 2026, long after Romania approved Petitioners' extradition to the United Kingdom. *See* T.T. EXT DE 72-1 at 35-36; A.T. EXT DE 68-1 at 37-45. Thus, Romania's extradition order cannot and does not cover all of the charges for which the United Kingdom seeks Petitioners' extradition from the United States. Moreover, Petitioners do not point to any legal authority precluding the Untied Kingdom from pursuing Petitioners' extradition elsewhere, even if on the same charges that were included in the Romanian extradition order. Petitioners also do not present any evidence that the United Kingdom violated any agreement with or order from Romania by seeking extradition from the United States. However, even if an agreement were breached, that would be a diplomatic matter between the United Kingdom and Romania and would have no bearing on the United States' treaty obligations to the United Kingdom.

ii. <u>Delay by the United Kingdom is not a Special Circumstance</u>

Petitioners next assert the need for detention is reduced because the United Kingdom delayed seeking their extradition. *See* ECF No. 1 at 47. However, they fail to articulate any significant delay that can be attributed to the United Kingdom, likely because the facts demonstrate nothing but prompt and consistent efforts by the United Kingdom to prosecute their case and extradite Petitioners. As Petitioners acknowledge, *id.*, the victims did not come forward until at least 2020, and U.K. prosecutors brought charges against Petitioners in early 2024. At best, any delay attributable to the United Kingdom would be from February 2025 through July of 2026—

when Petitioners' own evidence shows them taking at least 34 international flights to 12 different countries. *Ex. 22*. Petitioners are arguably responsible the remainder of the delay by deciding to forego returning to the United Kingdom and moving to Romania.

Even assuming delay—of which there was none—there is nothing in the extradition statute nor the Treaty that relieves the United States of its obligation to surrender fugitives simply because of the amount of time that has passed between the charged conduct and the presentation of an extradition request. "The Constitution does not of its own force impose on foreign governments the obligation to act speedily in seeking extradition of a fugitive from the United States." *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); *see also Martin*, 993 F.2d at 829 ("There is no Sixth Amendment right to a speedy trial in extradition cases."). Thus, this argument about diplomatic necessity is, as a general matter, without merit. *See, e.g., Martinelli Berrocal*, 263 F.Supp.3d at 1299 ("A number of other courts have rejected arguments similar to Pres. Martinelli's contention concerning diplomatic necessity.").

Regardless, any supposed delay here would be far shorter than the time elapsed in other cases where delay arguments have been rejected. *See, e.g., Martin*, 993 F.2d at 830 (seventeen-year delay in seeking extradition was not a special circumstance); *Drumm*, 150 F. Supp. 3d at 98-99 (seven-year delay was not a special circumstance); *Johnson*, 2012 WL 3929811, at *4-5 (delay between the offense and the formal request for extradition was not a special circumstance, where the Mexican arrest warrant was issued in 2003 and the extradition bail hearing was conducted in 2012). Accordingly, because the length of pre-arrest delay does not affect the United States' treaty

obligations, and because there was no unreasonable delay here, alleged delay is not a "special circumstance" justifying bail.[18]

iii. Any Potential for Bail in the United Kingdom is not a Special Circumstance

The Court should reject Petitioners' argument that availability of bail in the United Kingdom for extradition proceedings, or for the underlying crimes, constitutes a special circumstance. *See* ECF No. 1 at 48-49. It is entirely speculative that a U.K. court would release a U.S. fugitive sought for extradition or a domestic defendant accused of multiple counts of human trafficking, rape, and assault, among other offenses. The mere *possibility* of bail is not a special circumstance because a U.S. court cannot discern whether a foreign court would grant bail to a particular defendant. *See In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 86-87 (S.D.N.Y. 2003) ("Here, at best, [the fugitive] has shown that the [requesting country's] bail statute would not preclude his release on bail.").

Moreover, it is well settled that, even if bail were guaranteed in the requesting country, that country's bail practices have no bearing on the United States' mandatory treaty and statutory obligations to deliver fugitives to that country. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1298; *Antonowicz*, 244 F. Supp. 3d at 1071; *Siegmund*, 887 F. Supp. at 1386-87 ("To say that the extraditee would have been granted bail in the requesting country had he been arrested there, or that he will be granted bail once returned there, thus misses the point."). Petitioners have failed to show that any potential for bail in the United Kingdom constitutes a special circumstance.

iv. Questions on Urgency to Arrest are Moot and Irrelevant

[18] Moreover, to the extent delay in pursuing extradition is relevant, the issue is for the Secretary of State to address. *See Martin*, 993 F.2d at 829; *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006).

Petitioners allege they are entitled to bail because their provisional arrests were not sufficiently urgent, as contemplated by the Treaty. ECF No. 1 at 49-52. However, claims related to the provisional arrests are moot because Petitioners are now being held on the basis of the U.K.'s formal extradition request. *See*, *e.g.*, *Martinez v. United States*, 828 F.3d 451, 470 (6th Cir. 2016) (en banc) (finding challenges to provisional arrests were moot because the fugitive's provisional arrest ended when the formal extradition request was submitted); *In re Extradition of Taylor*, No. 20-MJ-1069-DLC, 2020 WL 3893049, at *1 (D. Mass. July 10, 2020) (same).

However, even if not moot, Petitioners' allegation that their arrests lacked urgency does not constitute a special circumstance because the issue of urgency is not justiciable. *E.g.*, *Matter of Extradition of Correa*, No. 17-mc-14059, 2017 WL 8780154, at *2 (S.D. Fla. May 8, 2017). The reference to "urgency" in the Treaty's provision governing provisional arrest requests, Treaty, Art. 12(1), merely serves as the Treaty's Contracting Parties' guidance on when provisional arrest requests and execution may be appropriate. Thus, a determination on the urgency of a request lies within the discretion of the foreign sovereign and the executive authority of the requested state. *See Correa*, 2017 WL 8780154, at *2; *Matter of Extradition of Ernst*, No. 97-CRM.MISC-1PG.22, 1998 WL 51130 at *8 (S.D.N.Y. Feb. 5, 1998). Plus, an evaluation of urgency is not solely based on immediacy; it also implicates matters of foreign policy that are outside the purview of the Court. *See*, *e.g.*, *Arias Leiva v. Warden*, 928 F.3d 1281, 1287 (11th Cir. 2019); *Ernst*, 1998 WL 51130 at *11; *Russell*, 805 F.2d at 1218. Accordingly, an executive's determination of "urgency" is non-justiciable. *See*, *e.g.*, *Correa*, 2017 WL 8780154, at *2; *Ernst*, 1998 WL 51130 at *11.[19]

---

[19] To the extent some courts have found that the Government's assessment of urgency is reviewable, the Government's determination is entitled to deference at a minimum. *See United States v. Messina*, 566 F. Supp. 740, 745 (E.D.N.Y. 1983) (giving the Government's assessment of urgency "considerable weight to the judgment of the United States, given its foreign affairs interest in the matter").

But even if it were, the Government reasonably determined that Petitioners' arrests were urgent due to the serious and violent nature of the allegations and the extensive worldwide travel in which Petitioners engage. *See Ex. 22.* By Petitioners' own admission, they have spent only 64 days, or less than 13% of their time, in the United States between February 25, 2025, when the Romanian court lifted their travel restrictions, and July 13, 2026, when they last arrived in the United States. *See id.* Accordingly, their attempt to claim lack of urgency as a special circumstance fails.

v. Petitioners' Alleged Compliance with Romania's Conditions of Release is not a Special Circumstance

According to Petitioners, "[t]here is no greater 'special' circumstance than Petitioners' demonstrated compliance with Romania's conditions of release for more than three years." ECF No. 1 at 53. As established above, Petitioners' claim that they fully complied with the conditions of release is significantly undermined by the witness intimidation charges Romania lodged against them for conduct they committed while released from custody. Moreover, the Romanian court decisions granting bail confirm that the Romanian court made its decision to grant bail by applying a legal standard that is materially different than the one applicable here—a presumption in favor of bail that Government must bear the burden to rebut. ECF Nos. 1-1 at 3; 1-2 at 3. In addition, the Romanian decisions indicate that they were at least partially influenced by the length of time Petitioners had already spent in detention awaiting the criminal proceedings in Romania. *See* ECF No. 1-1 at 4. In this case, Petitioners have been detained for approximately three months.

Petitioners' attempt to analogize their case to *In re Extradition of Bowey*, 147 F. Supp. 2d 1365, 1368 (N.D. Ga. 2001), falls short. *See* ECF No. 1 at 54-55. Unlike Bowey, it does not appear that Petitioners are taking any actions to accept responsibility for the offenses of which they are accused, as they have (1) refused to return to the U.K. and (2) continue to fight extradition to

the U.K. Moreover, the record in *Bowey* does not indicate that Bowey had been charged with additional crimes designed to obstruct his judicial proceedings while previously on release from custody. Even still, the *Bowey* court did not specify whether it was concluding that past compliance was a special circumstance on its own or as part of a cumulative analysis. *See Bowey*, 147 F. Supp. 2d at 1368. Accordingly, Petitioners' reliance on *Bowey* is misplaced.

vi. Petitioners' Challenge to Probable Cause is not a Special Circumstance

Petitioners' further argue that they should be released from custody because the United Kingdom has not provided sufficient evidence to establish probable cause that they committed the alleged offenses. *See* ECF No. 1 at 55-57. The Court should reject this argument as premature.

An assessment of probable cause is outside the scope of extradition detention hearings. *See*, *e.g.*, *United States v. Risner*, 3:18-mj-765, 2018 WL 6809796, at *12 (N.D. Tex. Dec. 27, 2018) (citing *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 61 (D. Mass. 2010); *Sacirbegovic*, 280 F. Supp. 2d at 88; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658-59 (D.N.J. 1994)). Instead, the issue of probable cause should be addressed when the extradition court is considering whether to certify extradition to the Secretary of State. *See Martin*, 993 F.2d at 828; *see also Matter of Extradition of Martinelli Berrocal,* No. 17-cv-22197, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017).

The problem with proceeding with a probable cause analysis at this stage is highlighted by Petitioners' admission that they received copies of the U.K.'s extradition requests only two days before filing their habeas petition. *See* ECF No. 1 at 57. Thus, the habeas petition may not present all of the probable cause claims they intend to make before the extradition court. Additionally, at the time the habeas petition was filed, the extradition court had not yet scheduled Petitioners' extradition hearings, *see id.* at 7, 16, but the extradition court has since accepted the parties'

stipulation to hold the extradition hearings on November 19-20, 2026, approximately one month after this pleading is filed, T.T. EXT DE 69; A.T. EXT DE 71. If Petitioners successfully prove to the extradition court that probable cause is lacking on the U.K's charges, it would have to deny certification of extradition, causing Petitioners to be released from custody. Accordingly, it is premature and unnecessary for this Court to address probable cause in this habeas proceeding.

vii. Petitioners' Alleged Conditions of Confinement are not Special Circumstances

Petitioners' cannot show that the conditions of their confinement are so unreasonable that they amount to a special circumstance. The Bureau of Prisons ("BOP") retains wide latitude to decide how and where to house prisoners in consideration of their safety and that of other prisoners, staff, and the institution. Moreover, Petitioners' conditions of confinement are not unduly harsh.

As "the realities of running a penal institution are complex and difficult," the Supreme Court has "recognized the wide-ranging deference to be accorded the decisions of prison administrators." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433, U.S. 119, 126 (1977). BOP has statutory authority to determine the location, classification, and housing placement of a federal prisoner, and judicial review is limited. *See generally* 18 U.S.C. §§ 3621(b), 3624(b)(1), 3625, 4081; *see also Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (clarifying that "no due process protections [are] required ... [for] prisoner classification and eligibility for rehabilitative programs in the federal system ... [and that] Congress has given federal prison officials full discretion to control these conditions of confinement"). Consequently, "only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *Rish v. Johnson,* 131 F.3d 1092, 1096 (4th Cir. 1997). It follows, then, that only similarly excessive conditions could constitute a special circumstance in an extradition case.

Currently, Petitioners are in the Special Housing Unit ("SHU") for their safety and the safety of the institution, a decision that is within BOP's statutory authority. *See* 28 C.F.R. § 541.21 ("Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population."); *see also* BOP Program Statement 5270.12. As such, the mere fact Petitioners are in the SHU does not, in and of itself, constitute undue confinement.

Yet, at the bond hearing, Petitioners alleged that their confinement was unreasonable by falsely claiming, among other things, that they had been in solitary confinement; had been denied basic needs, including food; had lost weight; had little time outside of their cell; and were denied access to their legal counsel, both American and foreign. *See Ex. 21* at 100-03, 115, 120-21, 139-40. However, as the extradition court noted in its decision, their assertions were "thoroughly impeached by the Government at the August 27 hearing." A.T. EXT DE 64 at 25.

First, the Government presented evidence of the Tates commissary orders, which proved Petitioners not only had access to food, but had been allowed general population commissary in large quantities. *Ex. 10*, *19.* Additionally, as the extradition court noted, "[t]he Government elicited testimony from Respondent Tristan that he is now in possession of a radio. On cross-examination of Respondent Emory, the Government elicited testimony that Tristan, Emory, or both have been working as orderlies in FDC-Miami's SHU and have been allowed additional time outside their cell in that capacity." A.T. EXT DE 64 at 25. Moreover, as to weight loss, the extradition court observed that, "[h]aving viewed [Petitioners] shortly after their arrest in the courtroom . . . neither appeared to have lost any significant, i.e., visible amount of weight since they first appeared before the Court." *Id*. at 26-27. The extradition court also found, "[Petitioners] are cellmates, not in solitary confinement; they have time outside their cell, including work as an

orderly; and have regular if not daily visits with their attorneys." *Id.* at 27. Finally, the extradition court noted that, unlike the fugitive in *In re Toledo Manrique,* No. 19-mj-71055-MAG-1, 2019 WL 5168587 (N.D. Cal. Oct. 10, 2019), "[Petitioners] have advanced no evidence akin to the staff psychiatrist's report to substantiate their claim that [Petitioners'] conditions of confinement are 'strikingly similar' to those in *Toledo*." A.T. ECF DE 64 at 26.

Consequently, this Court should rule, as did the extradition court, that "[o]n this record and in light of the evidence advanced, [it] cannot conclude that [Petitioners] have met their burden to demonstrate, by clear and convincing evidence or by a preponderance of the evidence, that their conditions of confinement are so severe as to rise to a special circumstance warranting their release from detention." *Id.* at 27.

viii. Petitioners' Claim for Release due to the Anticipated Duration of Extradition Proceedings is Moot

Petitioners assert that the "projected length of the extradition proceedings" should be considered a special circumstance when "extensive investigation will be required to challenge probable cause." ECF No. 1 at 58. While some courts have found that "unusual" delay in the extradition proceedings may constitute a special circumstance, *e.g.*, *Matter of Extradition of Kirby*, 106 F.3d 855, 863 (9th Cir. 1996), the delay must be something beyond "factors applicable to all defendants facing extradition," *In re Extradition of Maniero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). For a delay to constitute a "special circumstance," it must be "unusual or excessive." *Antonowicz*, 244 F. Supp. 3d at 1070. Here, Petitioners have not provided any reason to think their proceedings will be unusually protracted. In fact, since Petitioners filed their habeas petition, the parties jointly filed and the court ordered a briefing and hearing schedule that would put the case before the extradition court for a decision in approximately four weeks from the filing of this pleading. T.T. EXT DE 73, 74; A.T. EXT DE 69, 70. That schedule moots Petitioners' argument

that the extradition proceedings will be protracted.[20]

ix. Petitioners' Fame is not a Special Circumstance

Petitioners argue that their notoriety and global visibility constitute special circumstances because they lack the ability to go into hiding. ECF No. 1 at 61-63. Setting aside that this appears to be an argument against flight risk instead of one in favor of a special circumstance, Petitioners' claims are in direct tension with their extensive social media posts and interviews in which they discuss their ability to avoid detection by using false identity documents in different names. *Ex. 1*, *7*, *8*, *9, 16*. However, even if they were to travel under their true identities, Petitioners' fame does not mean they would be unable to avoid detection. Petitioners' transparency about their locations on social media is not static; they can choose to stop doing that at any time. Social media is also not a reliable indicator of Petitioners' whereabouts. *Compare Ex. 22*, with *Ex. 18* (showing that the travel log Petitioners submitted to the extradition court was missing several trips that Petitioners photographed and discussed on social media and social media accounts did not capture all of the trips listed in the log). And, it is possible that some of Petitioners' millions of dedicated followers on social media platforms may be willing to take extraordinary measures to help Petitioners to go into hiding. Accordingly, Petitioners' status as "celebrities" is not a special circumstance.

x. Petitioners' Ongoing Civil Litigation is not a Special Circumstance

In another example of an argument that appears to relate more to flight risk, Petitioners argue that pending civil litigation to which they are parties is a special circumstance because it is

[20] Any further delay caused by or attributed to Petitioners beyond the normal course cannot form the basis of a special circumstance. *See, e.g.*, *In re Extradition of Carr*, No. 20-CR-370, 2020 WL 4816052, at *7 (N.D. Ill. Aug. 18, 2020); *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States ex rel. McNamara v. Henkel*, 46 F.2d 84 (S.D.N.Y. 1912) (delay justifies bail "only where the hearing date comes and the complainant is not ready to proceed").

strong evidence of their intent to remain in southern Florida. ECF No. 1 at 63-64. However, the existence of the pending lawsuit is not nearly as convincing as Petitioners claim.

As referenced in Petitioners filing, they are plaintiffs in a defamation suit in Palm Beach County against a woman whose accusations—that Petitioners engaged in sexual assault and human trafficking—are directly related to the pending criminal charges against Petitioners in Romania. *Id.* at 63. Petitioners claim that "more than money is on the line" in that case because their "reputation depends on this litigation." *Id.* However, the defamation case has nothing to do with the pending criminal charges in the United Kingdom, which they are apparently not rushing to resolve despite any reputational rehabilitation that might occur if those allegations are disproven. Moreover, even if Petitioners were successful in the defamation case, it is not clear how defeating the claims of one accuser would alter the remaining charges in Romania. But more importantly, Petitioners make no effort to explain the connection between the defamation case and the viability of the charges in the United Kingdom, which are based on complaints from seven unconnected women alleging criminal conduct that occurred within the jurisdiction of the United Kingdom. Because the legal consequences of abandoning the defamation case are primarily monetary and would seemingly have little to no effect on the U.K. charges, any incentive to remain in Florida to resolve the defamation lawsuit pales in comparison to the incentive to flee the jurisdiction to avoid potentially lengthy criminal sentences in the United Kingdom.

Petitioners' reliance on *Bowey*, 147 F. Supp. 2d at 1368, is no more helpful to them. In *Bowey*, the court found that a fugitive's participation in civil proceedings constituted a special circumstance that warranted release. 147 F. Supp. 2d at 1368. However, the nature of the civil suit in that case is wholly distinct from Petitioners' defamation suit. Bowey was charged in the foreign country with child abduction, and at the time of the extradition proceedings, he had been

engaged in divorce and custody litigation that would have addressed whether Bowey can lawfully retain custody of his children. Thus, unlike Petitioners' defamation case, the civil proceedings in *Bowey* "directly related to the reasons for his extradition." *Id.* Accordingly, the Court should decline to follow *Bowey* and reject Petitioners' request for a finding of special circumstances.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court deny the petition for a writ of habeas corpus.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Alejandra L. López*
ALEJANDRA L. LÓPEZ
Assistant United States Attorney
Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: */s/ Abbie D. Waxman*
ABBIE D. WAXMAN
Assistant United States Attorney
Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov

A. TYSEN DUVA
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

By: */s/ Kerry A. Monaco*
KERRY A. MONACO
Associate Director
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503560
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By: */s/ Rachel M. Yasser*
RACHEL M. YASSER
Trial Attorney
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503561
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 674-5702
Email: Rachel.Yasser2@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 23, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Alejandra L. López*_________
Alejandra L. López
Assistant United States Attorney