**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 26-cv-27049-DAMIAN

EMORY ANDREW TATE, and
TRISTAN TATE,

Petitioners,

v.

TODD BLANCHE,

United States Attorney General,

MARCO RUBIO,

United States Secretary of State,

PRISCILLA PEREZ LOPEZ,

U.S. Marshal for the Southern District of Florida, and

E.K. CARLTON,

Warden, Federal Detention Center, Miami,

Respondents.
_________________________________/

**PETITIONERS' REPLY IN SUPPORT OF PETITION**
**<u>FOR WRIT OF HABEAS CORPUS</u>**

## INTRODUCTION

The government maintains that Andrew and Tristan's detention is necessary for the duration of the extradition proceedings "in order to preserve reciprocal and diplomatic relations with foreign partners." ECF#19, p. 2. The government does little more than point to the United States' diplomatic interests to support its position that extraditees should bear the extraordinary burden of proving not only that they are neither flight risks nor dangers to the community, but also that undefined and tenuous "special circumstances" warrant release. *See Wright v. Henkel*, 190 U.S. 40 (1903). But if the government's only interest is preventing flight, "bail must be set by a court at a sum designed to ensure that goal, and no more." *United States v. Salerno*, 481 U.S. 739, 754 (1987). Accordingly, *Wright*'s "special circumstances" test should be read to mean circumstances that will reasonably assure the extradition court that the extraditee is not likely to flee or pose a danger to the community—precisely the circumstances that protect the United States from diplomatic embarrassment.

Under our Constitution, it is the government that should bear the burden of showing that an extraditee must be detained, not the other way around. And if conditions of release, short of incarceration, can secure the government's interest in being able to surrender the Tates to the United Kingdom if extradition is certified, the extraditees should be entitled to release on bond.

The record here shows that such conditions exist, and that Romania has relied on them for years. On July 23, 2026, after Romania brought the very witness-influencing charges on which the government now relies, Romanian prosecutors told the Department of Justice that Andrew and Tristan "have fully complied with the obligations imposed upon them, appearing in response to all summonses from the judicial authorities and complying with the measures ordered on each occasion." ECF#19-2, p. 7. The Crown Prosecution Service has also confirmed that the Romanian court has already ordered the Tates' surrender to the United Kingdom upon the conclusion of domestic proceedings in Romania. ECF#19-1, p. 5. That order remains in place notwithstanding the new charges in the U.K. The government asks this Court to keep two United States citizens, charged with no crime

in this country, in the harsh conditions of the Special Housing Unit ("SHU") at FDC-Miami to protect a diplomatic interest that the United Kingdom has already secured.

## ARGUMENT

### I. The Court Reviews the Detention Order De Novo.

The government "presumes that a de novo standard of review applies." ECF#19, pp. 8–9. Petitioners agree that in reviewing a habeas petition, the district court is not required to give deference to the extradition court's weighing of the evidence. Nor does the government dispute the core facts, including that the Tates spent more than three years under Romanian supervision without a single violation; Romanian prosecutors themselves represented in February 2025 that there were "no plausible grounds" to believe the Tates would flee, ECF Nos. 1-1 and 1-2; and, by the government's own count, the Tates traveled internationally on 34 flights to 12 countries, and after each trip they returned to Romania as required by the Romanian courts. ECF#19, pp. 24–25, 28. The question, then, is not whether the Tates have demonstrated that they will comply, because they have, but rather whether the law permits detaining them anyway.

### II. The Government Should Bear the Burden of Establishing that Extraditees Must be Detained.

The government relies on *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 827 (11th Cir. 1993), which states, without elaboration, that "[i]n extradition cases there is a presumption against bond," citing *Wright v. Henkel.* But as set forth in the Petition (ECF#1), nothing in *Wright* actually established such a presumption. To the contrary, the Supreme Court stated it was "unwilling to hold that the circuit courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief." 190 U.S. at 63. And whatever the *Wright* decision meant in 1903, it predates GPS monitoring and the other tools that now all but ensure an extraditee's delivery to the requesting country. *Martin*, for its part, does not explain the source of the presumption or why it is constitutional. 993 F.2d at 827. It does not hold that an extraditee must disprove flight risk and danger, and it does

not identify the quantum of proof required. Nor did *Martin* confront the due process and Excessive Bail Clause challenges raised here. But the Eleventh Circuit acknowledged in a footnote the growing view that bail in extradition cases should turn on flight risk alone: "Some commentators have recently begun urging that bail decisions in international extradition cases be made to depend only on whether the defendant is a flight risk." *Id.* at 827 n.4. The Eleventh Circuit declined to depart from the "special circumstances" requirement only because it considered itself bound by precedent and was aware of no court that had done so: "We, of course, are bound by Supreme Court and Eleventh Circuit precedent. Furthermore, we are aware of no decision in which a federal court has departed from the legal requirement that a defendant prove 'special circumstances.'" *Id. Martin* thus leaves open whether the Constitution permits placing the burden on an extraditee to establish special circumstances warranting release.

The government's response does not address Petitioners' argument that, under federal laws dating back to the 1700s, the government bears the burden of persuasion to demonstrate that a criminal defendant should remain detained. *See United States v. Quartermaine,* 913 F.2d 910, 915 (11th Cir. 1990). In fact, "[f]rom the passage of the Judiciary Act of 1789, 1 Stat. 73, 91," federal law has "unequivocally provided that a person arrested for a noncapital offense *shall be admitted to bail*." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). Rather than respond to that history, the government devotes most of its constitutional argument to the proposition that extradition is "not criminal." ECF#19, pp. 11–14. But even if extradition proceedings are not criminal, the purposes underpinning detention in criminal and extradition proceedings are the same: to prevent flight and protect the community. Petitioners' claims arise under the Due Process Clause of the Fifth Amendment and the Excessive Bail Clause of the Eighth Amendment. *Martin* itself recognizes that these rights apply regardless of whether the proceeding is criminal or international: "The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." 993 F.2d at 829. Only "[c]onstitutional procedural protections which by their terms are applicable only in criminal cases," like the Sixth Amendment, would not apply in extradition proceedings. *Id.* The response does not

argue that the Fifth Amendment's due process protection is, by its terms, confined to criminal cases; instead, it asserts that "the extradition treaty governs alongside the Constitution," suggesting that constitutional rights should be curtailed by the treaty. ECF#19, p. 14. That suggestion cannot be squared with *Martin*.

Indeed, the government concedes that detention exists to prevent an extraditee from fleeing "the jurisdiction, and be[ing] unavailable for surrender." ECF#19, p. 13 (quoting *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)). This is a flight-prevention interest. Therefore, only the conditions necessary to prevent flight may be imposed. *See Salerno*, 481 U.S. at 754–55; *Stack v. Boyle*, 342 U.S. 1, 5 (1951). And if extradition concerns "not punishability but prosecutability," ECF#19, p. 12, then detention beyond what is needed to secure the ability to surrender the extraditee to the requesting country serves no legitimate purpose, and the government should have to justify it. The government never addresses *Salerno* in its papers, nor does it address *Quartermaine*, which holds that requiring a defendant "to come forward with evidence does not shift to the defendant the government's burden of persuasion." 913 F.2d at 915–16.

Next, the government is wrong in asserting that adopting Petitioners' position would require discovery, confrontation, or "mini-trials." ECF#19, pp. 13–14. Petitioners ask only that the burden to justify detention rest where it has rested since the Judiciary Act of 1789—on the government.

The government concedes that "courts have not developed a consistent definition of the term 'special circumstances,'" but makes no argument as to how a defendant can meet the test. ECF#19, p. 10. Calling the inquiry "individualized" does not create a standard; an individualized inquiry still requires a rule of decision. *Id.* at 15. The government's own cases confirm that extraditees are often detained even when they do not pose a risk of flight or danger. *See, e.g., Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 97–100 (D. Mass. 2015) (an extraditee may be detained even when he poses no danger and any risk of flight "could be adequately mitigated"); *United States v. Leitner*, 784 F.2d 159, 161 (2d Cir. 1986) ("Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance). ECF#19, pp. 10, 23. This is precisely the "absurd result[]" Judge

Hacker identified in *Garcia*: detaining a person who will not flee, for no reason other than the absence of an undefined "special circumstance." *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 473 (S.D. Tex. 2010). Detention that serves no legitimate purpose is not regulation, but punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535–39 (1979).

The government says the standard is "operating as intended" because more extraditees are detained than released, ECF#19, p. 16, but argues that Petitioners' appendix of 40 bail grants shows release is not rare. *Id*. at 16 n.12. The government cannot have it both ways. What the appendix actually demonstrates is that the circumstances that were rejected by the magistrate judge here—delay, bail in the requesting country, notoriety, civil litigation, prior compliance—have been found "special" elsewhere. That is the definition of an arbitrary standard.

The government cites *Bell's* statement that the presumption of innocence "has no application to a determination of the rights of a pretrial detainee during confinement." ECF#19, pp. 16–17 (quoting 441 U.S. at 533). *Bell* addressed conditions inside a jail, not whether a person may be jailed at all. On that question the Supreme Court has been explicit: "Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack*, 342 U.S. at 4.

None of the government's arguments suffices to show why the extraordinary burden of showing "special circumstances" should fall on an extraditee, especially where the burden is on the government to demonstrate that domestic defendants should remain detained under the Bail Reform Act. Petitioners do not claim an absolute right to bail; they argue only that the heavy presumption applied against them in this extradition proceeding is unconstitutional. In extradition proceedings, *Wright*'s "special circumstances" test should be interpreted to mean circumstances that will reasonably assure the extradition court that the extraditee is not likely to flee or pose a danger to the community, and the government should bear the burden of demonstrating that the extraditee is a flight risk or a danger to the community.

Even if *Wright v. Henkel* has been rightly understood to impose a presumption against bail in extradition cases, it should not be interpreted to shift the burden of

persuasion from the government to the defendant. For example, certain federal offenses trigger a presumption against bail under the Bail Reform Act. *See* 18 U.S.C. § 3142(e)(3). But that presumption is rebuttable under the statute. Even in cases where there is a presumption, the Eleventh Circuit has held that while "the defendant carries the burden of production to come forward with evidence to rebut the presumptions," the defendant's obligation to come forward with evidence "does not shift to the defendant the government's burden of persuasion." *Quartermaine,* 913 F.2d at 916. Here, the magistrate judge erred by shifting the burden of persuasion to the Tates. This warrants habeas relief.

**III. Andrew and Tristan Have Met Their Burden to Demonstrate They Should Be Released on Reasonable Conditions.**

If the Court applies a presumption against bail to the Tates, Andrew and Tristan have more than met their burden of production to rebut the presumption. *See Quartermaine*, 913 F.2d at 916. Several witnesses, including the Tates, testified on their behalf or submitted sworn statements regarding their history of compliance and cooperation with law enforcement, as well as Andrew and Tristan's close ties to their children. They also submitted videos in which women described by the Romanian government as victims explained they do not consider themselves victims at all. 26-mj-03260-LFL, ECF#66; 26-mj-03259-LFL, ECF#68; ECF#69.

**a. Andrew and Tristan Are Not a Risk of Flight.**

The government relies principally on social-media hyperbole to support its claim that the Tates pose a flight risk. The Tates, by contrast, presented affirmative evidence that they will not flee and have every incentive to comply with conditions of release. They have always cooperated with authorities and have never fled from a criminal investigation. They have known about the pending charges against them in the U.K. and that they will be surrendered to the U.K. after the conclusion of the Romanian proceedings—and yet, after every trip abroad, they returned to Romania.

Even the social media posts that the government claims show a "propensity for avoiding the United Kingdom by publicly mocking U.K. authorities and their inability to extradite them" show that Petitioners have always been completely transparent about their

location. In the post cited by the government, Andrew states: "Here I am. I'm in Hong Kong. I'm going nowhere. Come get me." ECF#19-1 at 7. A person fleeing from law enforcement does not broadcast his current location to the world.

The government points to the @ofWudan account and the "Vladimir Scorpius" document to attack Petitioners' credibility and suggest a risk of flight. ECF#19, pp. 7 n.8, 21. Andrew testified at the hearing that the @ofWudan account did not belong to him; it was a fan account run by someone pretending to be him. ECF#19-21, p. 162. Andrew explained that he told his followers to follow that account because he had no social media at the time and therefore he routinely "advertised my biggest fan accounts" so that his fans could "keep up to date with [his] life." *Id.* That testimony explains why Andrew once promoted an account he did not control.

As to the "Vladimir Scorpius" document, Tristan testified that his assistant created it, that he had never been to Mexico or to any Mexican embassy anywhere in the world, and that he never attempted to travel using it. ECF#19-21, pp. 122, 130. Tristan explained, "Vladimir Scorpius is a fictional supervillain from one of my favorite books." *Id.* at 122. The government conceded at the hearing that the "CURP" number on the document did not prove that an actual Mexican passport was issued. *Id.* at 268–70. In short, no Mexican passport was ever shown to exist, and the document was never used to travel anywhere.

The government's remaining points do not establish an "unmitigable" risk of flight. ECF#19, p. 21. The Tates have not gone to England because the Romanian court postponed their surrender until its case concludes, as Romanian law requires. Their adherence to a judicial order does not mean they will flee from the U.K. And the government never explains why the proposed conditions of release—including surrender of their passports (already in counsel's custody), home detention, GPS monitoring, and private security at the Tates' expense—would fail to assure their appearance. In sum, the affirmative evidence the Tates have presented, which includes years of international travel coupled with unbroken compliance with Romanian conditions of release, demonstrates that, even if the burden rests with them, the Tates do not present a risk of flight and should be released on reasonable conditions.

**b. Andrew and Tristan Are Not a Danger to the Community.**

The government continues to rely on the nature of the offenses alleged and the allegations of witness tampering in an effort to show that the Tates are a danger to the community. But the Tates' record on release in Romania refutes that claim. With those same charges and witness-tampering allegations before it, the Bucharest Tribunal rejected the prosecution's August 2024 request for pretrial detention as unfounded, imposed house arrest on Andrew and judicial supervision on Tristan, and the Romanian appellate court rejected the prosecution's appeal. On September 5, 2024, the appellate court went further: it lifted Andrew's communication restriction concerning one alleged victim and Tristan's 50-meter restriction concerning other alleged victims. No. 26-mj-03260, ECF#30-4, pp. 1–2.

In February 2025, the courts ended Tristan's judicial supervision and replaced Andrew's house arrest with judicial supervision. They also lifted specified witness-contact restrictions on Andrew and removed his territorial travel prohibition. *Id.* at 2–4. The February 2025 orders permitted international travel. No. 26-mj-03260, ECF#30-5, pp. 8–10; ECF#30-6, pp. 8–9. When Romania brought new charges in July 2026, Andrew remained under judicial supervision and Tristan was again placed under judicial supervision; neither was incarcerated. ECF#19-2, p. 7. Time and again, the Romanian courts—with the witnesses and the evidence before them—chose measures short of incarceration. And each time, the Tates appeared as required and fully complied.

As to the witness tampering allegations, the government concedes that there are no allegations of threats or physical harm but argues that the allegations still support a finding of dangerousness. That argument is contradicted by the record, including videos introduced at the detention hearing in which women whom the Romanian government describes as victims state that they are not victims at all. No. 26-mj-03260-LFL, ECF#66; No. 26-mj-03259-LFL, ECF#68, ECF#69. And the government does not identify a single witness who was actually intimidated by Andrew or Tristan. The unsubstantiated allegations do not establish dangerousness under either a clear-and-convincing or a preponderance standard.

### c. Special Circumstances Warrant Release in This Case.

Finally, as described at length in the Petition (ECF#1), numerous special circumstances support the Tates' release, including their record of compliance under Romanian supervision, the existing order securing their surrender to the United Kingdom, the conditions of their confinement in the SHU, and the delay before their extradition hearing. The fact that the United Kingdom has brought new charges against the Tates does not invalidate the standing surrender order—Romania will still be required to surrender to the U.K. after the Romanian proceedings. And on October 29, 2026, the Department of Justice notified undersigned counsel that Romanian authorities have summoned Andrew and Tristan to appear before the Romanian court on November 5, 2026, and Tristan to appear again on December 2, 2026. *See* October 29, 2026 Letters from DOJ to H. Srebnick, attached as Exhibit A. Continued detention here will prevent them from answering those summonses and participating in the criminal proceedings pending against them in Romania. Yet absent relief from this Court, the Tates will remain in the SHU at FDC-Miami until the conclusion of the extradition proceedings.

## CONCLUSION

The Court should construe *Wright*'s "special circumstances" standard consistently with due process—as requiring only circumstances that reasonably assure the extraditee's appearance and the community's safety—and should place the burden on the government. Petitioners also preserve their argument that the presumption against bail is unconstitutional. Under any standard, the Tates have shown that they pose neither a risk of flight nor a danger to the community. Andrew and Tristan respectfully request that the Court grant the Petition, vacate the detention orders, and order their release on reasonable conditions that will assure their appearance at all proceedings.

Respectfully submitted,

*/s/ Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 407-1005
tamaniotis@equitylegalfirm.com
Counsel for Petitioners

*/s/ Stephen James Binhak*
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICES OF STEPHEN JAMES BINHAK
One Southeast Third Avenue, Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com

*/s/ Howard Srebnick*
*/s/ Alexa Klein*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)
BLACK SREBNICK
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

HSrebnick@RoyBlack.com
JPerczek@RoyBlack.com
AKlein@RoyBlack.com
JGoldman@RoyBlack.com